**James D. MURPHY and Rosemary Murphy, Plaintiffs-Appellees,**

**v.**

**The CINCINNATI INSURANCE COMPANY, Defendant-Appellant.**

**No. 84–1152.**

United States Court of Appeals,
Sixth Circuit.

Argued May 3, 1985.

Decided Sept. 16, 1985.

Rehearing Denied Nov. 27, 1985.

274

Phillip K. Yeager, Denenberg, Tuffley, Thorpe, Bocan and Patrick, Southfield, Mich., John Lawson (argued), Southfield, Mich., for defendant-appellant.

Robert E. Toohey (argued), Kiefer, Allen, Cavana & Toohey, Bloomfield Hills, Mich., for plaintiffs-appellees.

Before JONES and KRUPANSKY, Circuit Judges, and PHILLIPS *, Senior Circuit Judge.

KRUPANSKY, Circuit Judge.

Defendant, the Cincinnati Insurance Company, appealed from a judgment entered pursuant to a jury verdict awarding plaintiffs James and Rosemary Murphy the proceeds of a fire insurance policy and attorney fees incurred as a consequence of defendant's bad faith refusal to pay the plaintiffs' fire loss claim. The policy, which was issued by the Cincinnati Insurance Company, insured plaintiffs' residence in Newport, Michigan, and its contents against loss caused by fire. It covered loss to the building in the amount of $60,000, loss of personal property not to exceed $30,000 and living expenses incurred as a result of the residential structure being rendered uninhabitable by fire.

The Murphys' home was destroyed by fire on October 14, 1982. Shortly before the fire, the Murphys had made plans to relocate to Florida. They placed their residence on the market, and on September 13, 1982, entered into an agreement to sell it for $46,000 and scheduled a closing date for October 18, 1982. The Murphys had arranged for an auctioneer to sell their furniture and other personal property, including many antiques. The auctioneer had planned to remove the personal property on October 14, 1982, but early that day telephoned Rosemary Murphy and advised her that he would relocate the property at a later date because of a lack of warehouse space for the items in question.

Neither the house nor personal property was ever sold, however, because on October 14, 1982, fire destroyed the house and its contents. The Fire Marshall and Deputy Chief, John Qualey (Qualey), conducted an investigation in which both James and Rosemary Murphy cooperated. Qualey concluded that the fire had been caused by arson. He testified that 27 fires caused by arsonists had occurred in the area of the Murphys' home between 1979 and June 1, 1983.

At the time of the fire, Rosemary Murphy was at her place of employment. James Murphy testified that he was at a bar located some distance from the residence. Both Murphys categorically denied having any knowledge as to who had caused the fire and having participated,

---

* Judge Phillips attended the oral argument in this case but did not participate in this decision due

to his untimely death on August 3, 1985.

directly or indirectly, in causing the fire. The defendant introduced evidence at trial which disclosed that the Murphys were experiencing financial difficulties and that their monthly obligations often exceeded their monthly income.

Michael Lane (Lane), the Murphys' son-in-law and a fireman in Dearborn, Michigan, had been at the Murphys' residence on the day of the fire. He had planned to be present when the auctioneer came to remove the antiques and other furniture and to assist in effectuating the transfer of property to the auctioneer. Since he was not aware that the auctioneer had rescheduled his appointment, Lane proceeded to the Murphys' home at approximately 1:30 P.M. and remained there for 15 minutes. He then returned to his residence in Dearborn and subsequent to learning of the fire, returned to the scene and advised Qualey of his earlier visit.

The Murphys retained Claims, Inc., a public adjusting firm, to process their claim with the Cincinnati Insurance Company. Claims, Inc. calculated the loss assignable to the house to be $88,168.56, and the loss of personal property in the amount of $73,477.42. The Murphys presented the claim to the Cincinnati Insurance Company on November 7, 1982. On December 8, 1982, the Murphys submitted to a deposition conducted by legal counsel for the insurer. During the course of his examination, James Murphy volunteered to undergo a polygraph examination concerning the fire. At trial, James Murphy was permitted to testify to his willingness to submit to the polygraph examination.

On December 16, 1982, the Cincinnati Insurance Company denied the Murphys' claim, citing the following reasons: (1) the fire was intentionally caused by the Murphys or by persons in privity with them; (2) the Murphys misrepresented and concealed material facts and falsely swore to the causes and origin of the fire; (3) the Murphys failed to provide proper documentation and evidence supporting the amount of their claim; and (4) the amount claimed far exceeded the true actual cash value and amount of loss and damage sustained.

The notice of denial was executed by Steven Clark (Clark), the adjuster in charge of processing the claim for the Cincinnati Insurance Company. At trial, Clark testified that he determined that the Murphys had been involved with the arson because they had a motive to burn their home so as to receive $60,000 in insurance proceeds, i.e., a greater sum than they would have realized from the pending sale of the real property ($46,000). Further, he concluded that the Murphys had an opportunity to torch the house since he disbelieved James Murphy's statement that he had been at a bar several miles from his residence at the time of the fire. Clark indicated that his conclusion that the Murphys had been involved in the arson was also based, in part, on the presence of the Murphy's son-in-law, Lane, at the house on the day of the fire. Neither Clark nor anyone from the Cincinnati Insurance Company, however, contacted or interviewed Lane prior to denying the claim. In addition, an investigator who had been retained by defendant to investigate the fire, had concluded that he was unable to link the fire to any culpable activity of the Murphys, although he believed that Lane "very well could have been responsible." However, at no time, either before defendant denied the claim or during trial, did the special investigator or Clark attempt to connect Lane to any participation or agreement with the Murphys to cause the fire.

The jury returned a verdict for plaintiffs in the amount of $60,000 for the loss of their home, $30,000 for the loss of their personal property and $1,080 for living expenses incurred as a result of their house being rendered uninhabitable.

The jury also concluded that the Cincinnati Insurance Company failed to act "fairly and reasonably" in investigating and denying plaintiffs' claim and that its actions reflected a "callous disregard for the rights of the plaintiffs." The district court subsequently awarded the Murphys $16,637.59 in attorney fees in *Murphy v. Cincinnati Insurance Co.*, an opinion published at 576 F.Supp. 542 (E.D.Mich.1983).

On appeal, the Cincinnati Insurance Company charged as error the district court's: (1) interpretation of Michigan law to permit an award of attorney fees as a proper measure of damages arising out of an insurer's breach of its implied contractual duty to act fairly and reasonably in investigating and refusing to pay an insured's claim; (2) admission of evidence of John Murphy's willingness to submit to a polygraph examination; and (3) refusal to grant a directed verdict against plaintiffs on their bad faith claim and judgment notwithstanding the verdict in favor of defendant on its affirmative defenses of arson and fraud.

Defendant challenged the district court's conclusion that attorney fees are recoverable where an insurer is found to have breached its duty to act in good faith in investigating and refusing to pay a claim. Contrary to the assertions of the defendant, the district court did not create or recognize a separate and independent cause of action predicated upon "negligent investigation"; rather, it determined that attorney fees are a reasonable measure of damages arising out of a breach of contract. On three occasions in its charge, the trial court instructed that in order to determine that defendant breached its duty to act in good faith, the jury must find that it acted in "callous disregard" for the rights of the plaintiffs.[1]

Defendant contended that *Kewin v. Mass. Mut. Life Ins. Co.*, 409 Mich. 401, 295 N.W.2d 50, 56 (1980), precludes an award of attorney fees for bad faith conduct of an insurer. Contrary to defendant's assertion, however, *Kewin* did not address the issue of assessing attorney fees under circumstances similar to those in the instant action. In a footnote, the Michigan Supreme Court expressly reserved passing judgment on the issue until some future time:

> We do not address a question not raised: Whether compensation for attorney's fees or other items of pecuniary loss caused by a breach of the insurer's contractual obligation to process claims in good faith might be recoverable if properly pleaded.

*Kewin*, 295 N.W.2d at 55 n. 2.

■ Accordingly, *Kewin* indicates that Michigan recognizes a contractual obligation on the part of an insurer to act in good faith. The duty has been expressly recognized in cases involving the settlement of third party claims against an insured. *See e.g., Wakefield v. Globe Indemnity Co.*, 246 Mich. 645, 225 N.W. 643 (1929) (holding that an insurer was liable to its insured for an excess of judgment over the face of the policy when the insurer, having exclusive control over the settlement, fraudulently or in bad faith refused to compromise a claim for an amount within the policy limit); *accord Citizens Mut. Ins. Co. v. Nationwide Ins. Co.*, 29 Mich. App. 91, 185 N.W.2d 99, 102 (1970). As the Michigan Supreme Court explained in *Wakefield*, the basis for this action is the violation of the "[p]rohibition against fraud or bad faith [which] is imposed by law upon every legal relationship." 225 N.W. at 644. The court further noted that the refusal by an insurance company to pay a claim must be "made in good faith and upon reasonable grounds for the belief" that the insurer was not liable to pay that claim. *Id.* at 645.

In view of *Wakefield* and the footnote in *Kewin*, the district court properly conclud-

---

1. Defendant asserts that a finding of bad faith requires a showing of "conscious wrongdoing, resulting from dishonest purpose or moral obliquity." In support of this proposition, defendant relies upon *Medley v. Canady*, 126 Mich.App. 739, 337 N.W.2d 909 (1983), a Michigan Court of Appeals decision involving the construction of a no-fault automobile insurance statutory provision regarding bad faith denial of claims. *See also Awrey v. Progressive Cas. Ins. Co.*, 728 F.2d 352 (6th Cir.1984) (repeating the *Medley* definition of bad faith). The Michigan Court of Appeals, however, in *Commercial Union Ins. v. Liberty Mut. Ins.*, 137 Mich.App. 381, 357 N.W.2d 861 (1984) subsequently confined the *Medley* definition of "bad faith" to the term as used in MCL § 500.2006(4), a provision of the Uniform Trade Practices Act. The court specifically refused to extend the *Medley* definition to a common law action such as the case before it. It defined bad faith as being more than negligence but something less than fraud. The district court's instruction in this case properly stated Michigan law.

ed that Michigan law recognizes a contractual obligation on the part of an insurer to act in good faith. The district court did not err by extending the duty of exercising good faith to the investigation of claims.

The district court determined that the attorney fees requested by the plaintiffs were a proper measure of damages arising from the breach. This court construed the applicable standard under Michigan law for identifying damages recoverable in a breach of contract action in *Salamey v. Aetna Cas. & Sur. Co.*, 741 F.2d 874, 877 (6th Cir.1984):

> A contract to insure against fire loss is a commercial contract, and damages for its breach are generally limited to the monetary value of the contract.... However, Michigan law follows the rule of *Hadley v. Baxendale*, 156 Eng.Rep. 145 (1854), that *"the damages recoverable for breach of contract are those that arise naturally from the breach* or those that were in the contemplation of the parties at the time the contract was made." *Kewin v. Massachusetts Mutual Life Insurance Co.*, 409 Mich. 401, 414, 295 N.W.2d 50 (1980).

(citations omitted, emphasis added).

Thus, damages are recoverable in an action for breach of contract when they "arise naturally from the breach." *See also International Harvester Credit Corp. v. Wilkie*, 695 F.2d 231, 234 (6th Cir.1982). The district court determined that defendant's breach of its implied contractual duty to investigate the claim fairly and reasonably caused the plaintiffs to incur the expense of the litigation to enforce their rights under the contract. Accordingly, the district court properly concluded that the expenditure of attorney fees arose naturally from the breach. In sum, the district court did not err by interpreting Michigan law to permit an award of attorney fees as a proper measure of damages arising out of an insurer's implied contractual duty to act fairly and reasonably in investigating and refusing to pay an insured's claim.

Defendant also argued that the district court committed reversible error by permitting James Murphy to testify about his willingness to undergo a polygraph examination. Fed.R.Evid. 401 vests the district court with wide discretion to determine whether proffered evidence is relevant and Fed.R.Evid. 403 grants the district court broad discretion to determine whether the "probative value [of the proffered evidence] is substantially outweighed by the danger of unfair prejudice."

In support of its contention, defendant relied heavily upon the premise that results of polygraph examinations are typically inadmissible. Defendant suggested that since results of polygraph examinations are inadmissible, "[i]t logically follows that ... an individual's willingness to submit to such a procedure is likewise inadmissible." This "logical" link is not, in fact, so evident. The threshold issue is whether plaintiff's willingness to submit to a polygraph examination is relevant. Fed.R.Evid. 401. Thus, admissibility turns on the relationship of the proffered evidence to other facts of the case, regardless of whether the results of polygraph tests are admissible. An insured's willingness to cooperate in an insurance company's investigation and request for a polygraph examination does not depend on the scientific acceptability which is necessary to support the admissibility of polygraph test results. Since James Murphy's willingness to submit to a polygraph examination reflected upon his credibility and the defendant's motive in refusing the claim, the district court did not err in concluding that the evidence is relevant.

Moreover, the district court permitted defendant wide latitude to present evidence to discount or discredit James Murphy's willingness to submit to a polygraph examination, thereby providing defendant a full opportunity to place the evidence in a balanced light. Accordingly, the district court did not abuse its discretion in finding, under Fed.R.Evid. 403, that any prejudice from the evidence did not substantially outweigh its probative value.

Defendant contended further that the district court committed reversible error by refusing to direct a verdict against plaintiffs on the issue of bad faith, sug-

gesting that plaintiffs introduced no evidence to support a finding of bad faith. Since the record discloses ample support for the jury's finding that the defendant acted in bad faith, the district court did not err in denying defendant's motion for a directed verdict with regard to the issue of defendant's bad faith.

Finally, defendant argued that the district court erred by refusing to grant judgment notwithstanding the verdict in favor of defendant on its affirmative defenses of arson and fraud. Although defendant urged that it demonstrated the existence of all the elements necessary to prevail on its affirmative defenses of arson and fraud, the jury apparently elected to believe the evidence offered by plaintiffs which negated the possibility of their involvement in the fire and disputed that they engaged in any fraudulent action. Thus, the district court properly denied defendant's motion for judgment notwithstanding the verdict.

For the reasons discussed above, the judgment of the district court is AFFIRMED.