In re Joseph E. SCRIMA, d/b/a Edisan
Shoe Specialists, and Karen
Scrima, Debtors.

Joseph E. SCRIMA, d/b/a Edisan Shoe
Specialists, and Karen
Scrima, Plaintiffs,

v.

INSURANCE COMPANY OF NORTH
AMERICA, Defendant and
Cross–Plaintiff,

and

Transamerica Insurance Company,
Defendant and Cross–Defendant.

Bankruptcy No. HK 85–01604.
Adv. No. 86–0198.

United States Bankruptcy Court,
W.D. Michigan.

July 31, 1990.

David L. Conklin, Grand Rapids, Mich., on behalf of debtors-plaintiffs.

Lawrence Mulligan, Grand Rapids, Mich., on behalf of Ins. Co. of North America.

Jonathan S. Damon, Grand Rapids, Mich., on behalf of Transamerica Ins. Co.

## INTRODUCTION

LAURENCE E. HOWARD, Bankruptcy Judge.

This proceeding is before this Court on remand from the United States District Court. The Debtors ("Scrima"), initiated this action against the Insurance Company of North America ("INA"), and Transamerica Insurance Company ("Transamerica"), for losses incurred when Scrima's business was destroyed by fire. The pending matters are whether INA, having settled with Scrima, can seek contribution from Transamerica, and whether Scrima can seek additional damages from Transamerica. Both matters are dependent on whether Scrima was excused from complying with Transamerica's 60 day proof of loss requirement. For the reasons set forth in this opinion, I am holding that when Transamerica cancelled Scrima's policy, effective September 11, 1985, it waived the 60 day proof of loss requirement. Thus, Transamerica is now estopped from asserting that requirement.

The Court's jurisdiction in this matter is twofold. The claim of Scrima against Transamerica is a core proceeding, as it relates to the enforcement of the provisions of an insurance policy for a post-bankruptcy petition loss. Pursuant to 28 U.S.C. § 157(b)(1), the Court may enter a final order. The claim of INA against Transamerica is a non-core proceeding be- cause it does not affect the Debtors' estate, and pursuant to 28 U.S.C. § 157(c)(1), the Court must submit proposed findings of fact and conclusions of law to the District Court.[1] INA would not consent to the Court entering a final order, as is permitted by 28 U.S.C. § 157(c)(2).

## FACTS

Scrima operated a shoe sales and repair shop. This business was insured by Transamerica. Evidently, Transamerica became uneasy with the condition of the premises, and on July 8, 1985, it wrote to Scrima's insurance agent, indicating that it wanted to cancel the policy. On July 26, 1985, Scrima filed a petition under Chapter 13 of the Bankruptcy Code. On August 9, 1985, Transamerica, not having received a response to its letter of July 8th, and also unaware that Scrima had filed for bankruptcy, sent a formal cancellation notice to Scrima. The cancellation was effective as of September 11, 1985. As a result, Scrima obtained replacement insurance from INA, to become effective on September 11, 1985, so that there would be no lapse in coverage. On September 13, 1985, Scrima's bankruptcy was converted to Chapter 11. On September 22, 1985, the business premises were destroyed by fire.

On December 6, 1985, Scrima's insurance agent filed a notice of loss with Transamerica. Transamerica rejected the notice, as it believed it had cancelled the Scrima policy. On March 16, 1986, almost six months after the fire, Scrima filed proofs of loss with Transamerica, which were also rejected. At this point neither insurance company would pay on the loss; INA because the cause of the fire was still under investigation, and Transamerica because it believed its policy was cancelled. Therefore, on March 6, 1986, Scrima filed this proceeding. Scrima eventually settled with INA, and on September 29, 1987, I entered an order approving the settlement in the amount of $102,339.70. On October 29, 1987, I granted INA's motion to file a

---

1. Because the claims of Scrima and INA are inextricably bound together, there is no separate report and recommendation to be forwarded to the District Court. Thus, this opinion will be sent for final entry of an order regarding INA's claims only.

cross-claim against Transamerica for contribution. Transamerica raised several affirmative defenses to that cross-claim, including that Scrima had failed to file timely proofs of loss.

Under the terms of the settlement, INA became the subrogee of a portion of Scrima's claim against Transamerica. Scrima continued the lawsuit because the Transamerica policy had higher policy limits on certain types of losses, and to obtain consequential damages from Transamerica. The adversary proceeding came to trial, and on August 16, 1988, I held that Transamerica had violated the automatic stay with its post-petition cancellation of Scrima's insurance policy. However, I held that the automatic stay should be annulled, that Scrima had consented to and ratified the cancellation, and that Scrima had no cause of action against Transamerica. In addition, on INA's cross-claim for contribution, I ruled that INA was the only insurer liable to Scrima.

Since the INA claim was decided on a report and recommendation basis, and because Scrima appealed, the case was forwarded to the District Court. In an opinion dated May 31, 1989, the Honorable Robert Holmes Bell rejected the findings of fact regarding INA and reversed the decision regarding Scrima.[2] Judge Bell held that Scrima did not legally consent to or ratify Transamerica's cancellation of the policy.[3] Further, Judge Bell ruled that since Transamerica's cancellation was violative of the automatic stay, it was void.[4] In addition, Judge Bell held that Michigan recognizes pro rata liability when the insured has more than one insurer.[5] The case was remanded.

Prior to the second trial, INA brought a motion for partial summary judgment on the issues of proof of loss and contribution. In a written opinion dated November 29, 1989, in accordance with Michigan law, I ruled that the amendatory endorsement of the Debtors' Transamerica policy, which required a proof of loss to be filed within 60

days after loss, superseded the language in the policy booklet, which required a proof of loss to be filed 60 days after being requested by Transamerica. This holding did not reach the issue of whether Scrima was excused from complying with the 60 day requirement, and I reserved for trial the issue of whether Transamerica could be estopped from asserting the 60 day proof of loss requirement as a bar to INA's claim for contribution. On the second issue, in accordance with Michigan law, I held that INA could seek contribution from Transamerica to limit INA's payment to the proportion of the loss that the amount insured by INA bears to the total insurance coverage.

After that opinion was issued, it became apparent that INA was a bit perplexed by the rulings. In a subsequent motion, it attempted to argue that the language in the policy booklet waived the language in the amendatory endorsement. In an effort to clarify my earlier opinion, I issued an order on April 2, 1990. In that order, I reiterated my earlier holding, that the language of the endorsement superseded language in the policy booklet. The order went on to take that holding to its logical conclusion, that the language of the policy booklet did not waive, supersede, or modify any contradictory language in the amendatory endorsement.

Not to be outdone, and in an effort to protect himself procedurally, Scrima filed a motion for summary judgment on April 6, 1990. Basically, the motion asserted the same basis as INA did in its previous motions, that the language of the policy booklet controlled over the amendatory endorsement, thus relieving Scrima of the 60 day requirement. To support his position, Scrima relied upon a letter from the Deputy Director of the Commercial Market Standards Division of the Insurance Bureau, Michigan Department of Licensing and Regulation. In that letter, the official related his division's opinion that the more

2. 103 B.R. 128 (W.D.Mich.1989).

3. *Id.* at 134.

4. *Id.* at 132.

5. *Id.* at 135.

liberal proof of loss language in the policy booklet should prevail over the language contained in the amendatory endorsement. I found the official's reasoning to be neither controlling nor persuasive, and denied Scrima's motion.

The trial was held April 24, 1990. As stated previously, the central issue is whether Transamerica's cancellation has the effect of estopping Transamerica from asserting the 60 day proof of loss requirement as a bar to the claims of Scrima and INA. Since I am so ruling, I must also determine the amount of the damages.

## WAIVER AND ESTOPPEL

■ None of INA's or Scrima's motions for summary judgment, subsequent to Judge Bell's opinion, clearly raised the issue of whether the cancellation itself waived the proof of loss requirement. Regardless, it would have been improper for a summary judgment motion because some questions of fact were entwined with the legal issues. As discussed earlier, the issue of waiver was only raised by INA and Scrima in terms of whether Transamerica waived the 60 day proof of loss requirement in the endorsement by reason of the language in the policy booklet. That was disposed of by the supplemental order of April 2, 1990.

While I expressly reserved the issue of estoppel for trial, this opinion relies on both waiver and estoppel, as they are intertwined. As stated in 28 Am.Jur.2d *Estoppel and Waiver* § 31 (1975) at 635:

Where an implied waiver is involved, the distinction between waiver and estoppel is close, and sometimes the doctrines merge into each other with almost imperceptible gradations, so that it is difficult to determine the exact point where one doctrine ends and the other begins. It is unquestionably true that the dividing line between waivers implied from conduct and estoppels oftentimes becomes so shadowy that in the law of insurance, for instance, the two terms have come to be quite commonly used interchangeably.

Michigan follows that general principle. In *Dahrooge v. Rochester German Insurance Co.*, 177 Mich. 442, 451–2, 143 N.W. 608 (1913), the Michigan Supreme Court stated:

A waiver is a voluntary relinquishment of a known right. Estoppel is based on some misleading conduct or language of one person which, being relied on, operates to the prejudice of another, and is applied to the wrongdoer by the court in denial of some right, which otherwise might exist, to prevent a fraud. The claim of plaintiffs in this case seems rather to suggest an estoppel, though in insurance cases the terms are freely used interchangeably, and it is sometimes expressed as waiver by estoppel.

Thus, the type of estoppel at issue is not "pure" estoppel, requiring nothing more than a checklist of elements, but rather an equitable doctrine triggered by Transamerica's waiver of the proof of loss requirement upon cancellation of Scrima's policy. It is Transamerica's waiver that gives rise to estoppel as a bar to resurrecting the relinquished contract right.

Many insurance cases that address waiver and estoppel involve an initial denial of liability by the insurer. Transamerica attempted to distinguish those cases by asserting that it did not deny liability within the 60 days following the fire. That may be true, but it is unimportant. The cancellation of Scrima's policy was tantamount to a denial of liability.

While I am holding that the cancellation of the policy itself was a denial of liability, there is one case that, at first blush, would be inapposite to this holding. Actually, it is a series of related cases: *Gambino v. Northern Insurance Company of New York*, 232 Mich. 561, 205 N.W. 480 (1925), *on reh'g*, 234 Mich. 651, 209 N.W. 119 (1926), and *Gambino v. Gratiot Lumber & Coal Co.*, 235 Mich. 70, 209 N.W. 120 (1926). It is necessary to give a rather lengthy recitation of the facts from the *Gambino* trilogy, so that the state court's opinions are read in the proper context.

Gambino received building materials from the lumber company to build a duplex, giving the company a lien to the ex-

tent of the value of the materials.[6] The lien was to be paid within a short time, but Gambino was unable to pay, so he executed a mortgage to the lumber company.[7] The duplex was insured for $3,000.00 by the Northern Insurance Company of New York, with the lumber company as the first payee on the policy and Gambino the second payee.[8] The lumber company paid the premium and charged it to Gambino's account, and Gambino subsequently reimbursed the lumber company.[9] Gambino also took out a second policy of insurance for $4,000.00, payable to the lumber company.[10] The lumber company was informed by the first insurer that the policy was cancelled.[11] The premium was refunded to the lumber company, who credited it to Gambino's account and later sent him a statement to that effect.[12]

Gambino defaulted on the mortgage, and the lumber company foreclosed.[13] At the sale, the lumber company bid in and took the property.[14] During the statutory redemption period of one year, the duplex was destroyed by fire.[15] The lumber company submitted a proof of loss to the second insurer and received payment.[16]

Two weeks after the fire, it appears that Gambino learned of the cancellation of the first insurance policy from an employee of the insurer's local agent.[17] Seven months after the fire, in May of 1922, Gambino's attorney contacted the agent directly and was again informed that the policy had been cancelled.[18] Nine months after the fire, in July of 1922, Gambino filed a proof of loss, which was rejected due to the cancellation.[19]

Shortly after speaking to the agent in May of 1922, and prior to the expiration of the redemption period, Gambino brought suit against the lumber company for the amount of the first policy, claiming that the lumber company had a statutory duty to inform him of the cancellation.[20] One year after the fire, in September of 1922, Gambino sued the first insurer, claiming that the policy could not be cancelled, and that the denials of liability by the agent and his employee could be attributed to the insurer, thus waiving the 60 day proof of loss requirement.[21]

In the first suit, the trial court determined that Gambino was not entitled to relief.[22] Gambino appealed, but prior to the hearing on that appeal, the second suit, against the insurance company, went to trial. The trial court held that the agents of the insurer waived the 60 day proof of loss requirement by denying liability, and judgment was entered for Gambino.[23] That decision was appealed by the insurance company.

The Michigan Supreme Court rendered two opinions on Gambino's suit against the insurer. In its first opinion, issued prior to its decision on the lumber company, it reversed the trial court, holding that the proof of loss requirement could only be waived by agents acting within their authority, and the insurer's agents had no

---

6. *Gambino v. Gratiot Lumber & Coal Co.*, 235 Mich. 70, 72, 209 N.W. 120 (1926) (hereinafter referred to as *Gambino III*).

7. *Id.*

8. *Gambino v. Northern Insurance Company of New York*, 232 Mich. 561, 562, 205 N.W. 480 (1925) (hereinafter referred to as *Gambino I*).

9. *Id.*

10. *Gambino III*, 235 Mich. at 73, 209 N.W. 120.

11. *Gambino III*, at 72, 209 N.W. 120.

12. *Gambino III*, at 72–73, 209 N.W. 120.

13. *Gambino III*, at 72, 209 N.W. 120.

14. *Id.*

15. *Gambino III*, at 72, 209 N.W. 120.

16. *Id.*

17. *Gambino I*, 232 Mich. at 562, 205 N.W. 480.

18. *Id.*

19. *Id.*

20. *Gambino III*, 235 Mich. at 73–74, 209 N.W. 120.

21. *Gambino I*, 232 Mich. at 563, 205 N.W. 480.

22. *Gambino III*, 235 Mich. at 73, 209 N.W. 120.

23. *Gambino I*, 232 Mich. at 564, 205 N.W. 480.

such authority.[24] The Court granted a rehearing, and rendered its opinion on the same day that it rendered its opinion on Gambino's appeal in the suit against the lumber company. On rehearing, Gambino raised an additional argument, that the cancellation itself was a denial of liability, and that the cancellation was void.[25] The Court reiterated its first decision, finding those grounds sufficient for affirmance, and went on to state that Gambino's new argument was inconsistent, because if the cancellation was void, the entire policy, including the proof of loss provision, was in effect.[26] In its opinion regarding Gambino's appeal of the lumber company suit, the Court upheld the trial court's judgment for the lumber company. While state law dictated that the policy could not be cancelled without notice to Gambino, the Court held that the lumber company was reasonable in assuming that Gambino knew of the cancellation since his account was credited with the refunded premium and he was sent a statement.[27]

I do not find the Court's opinions binding because of the factual differences between Gambino's and Scrima's circumstances, and the difference in the legal issues before that Court and me. On rehearing of the insurer case, the Court reaffirmed based on its earlier ruling, and thus the statements regarding the cancellation as a denial of liability are dictum. Factually, Gambino did not actually know of the cancellation of

the policy until two weeks after the fire, while Scrima knew prior to the fire that Transamerica had cancelled his policy. Coupling this with the fact that, while Transamerica's cancellation of the Scrima policy has been ruled invalid by Judge Bell, the *Gambino* court consistently held that the cancellation of the policy in that case was valid, it is apparent that the state court was not faced with the same facts or legal issues before me, again rendering its statements on rehearing regarding the inconsistency of Gambino's argument as nothing more than hypothetical dictum. Even if one accepts the Court's hypothesis, its reasoning is not applicable in this case. The Court stated: "Provisions requiring notice and proofs of loss serve a useful purpose. They give time and opportunity for investigation, negotiation, and settlement, and are sustained in the law." [28] These concerns are not vital in the present case because INA duly investigated the fire.[29]

Further, the equities of this situation lie with Scrima. If the purpose of the proof of loss requirement is so that the insurance company can promptly investigate the fire, here, Transamerica knew of the loss on the same day it occurred,[30] and INA made a prompt investigation from which Transamerica has accepted its results. As stated in *Dellar v. Frankenmuth Mutual Ins. Co.*, 173 Mich.App. 138, 148, 433 N.W.2d

**24.** *Gambino I*, at 564–65, 205 N.W. 480.

**25.** *Gambino v. Northern Insurance Company of New York, on reh'g*, 234 Mich. 651, 654, 209 N.W. 119 (1926) (hereinafter referred to as *Gambino II*).

**26.** *Id.* at 654, 209 N.W. 119.

**27.** *Gambino III*, 235 Mich. at 74, 209 N.W. 120.

**28.** *Gambino II*, 234 Mich. at 655, 209 N.W. 119.

**29.** Indeed, this same argument could be applied to Gambino's predicament, because proofs of loss were supplied by the lumber company to the second insurer, who presumably investigated before it paid on the loss. However, for some inexplicable reason, the Michigan Supreme Court ignored this fact.

**30.** Trial Exhibit 7A consists of a Transamerica internal memo and attachment, sent from Con-

nie Libs of the St. Joseph office, to Diana Kowatch of the Commercial Underwriting Department in the Battle Creek Regional Office. The memo, dated September 24, 1985, states:

> One of my adjusters paid a B & E under this policy on 9–9–85 so I naturally assumed that we would be handling a fire loss when I heard this on the news 9–22–85. When I did not hear from the De Vries Agency on Monday AM, I called and was delighted to find that they had been cancelled 9–9–85. Congratulations! Excellent job of underwriting.

Attached to the memo was a newspaper account of the fire, dated 9–23–85. It is interesting to note that the article mentioned Scrima's Chapter 11 bankruptcy. I find this contradictory to Transamerica's statement in its trial brief that "it is undisputed that Transamerica was not even aware of Mr. Sorima's bankruptcy until the December letter from Mr. DeVries." Transamerica's Supplemental Trial Brief at 4.

380 (1988), "[a] sworn proof of loss would add nothing in the context of this case, and its functional equivalent already existed." Since Transamerica rejected the notice of loss that Scrima filed on December 6, 1985, it is also reasonable to assume that if Scrima had filed his proof of loss within 60 days, Transamerica would have rejected it as well. Thus, Scrima's submission of such documents would have been a meaningless act.

As I have stated, and as the *Dahrooge* case pointed out, waiver and estoppel are closely bound together in these types of cases. The elements set forth in *Dahrooge*, which I have previously quoted, are established in this case. When Transamerica represented to Scrima that his policy was cancelled, it was indisputably an intentional act; Transamerica meant to cancel the policy. At that point, Transamerica had voluntarily waived all of its duties under the policy, as well as its rights. Scrima, ignorant of the effect of the automatic stay, accepted the cancellation and relied upon it by obtaining replacement coverage from INA.[31] Unless Transamerica is deemed to have waived the proof of loss requirement and is estopped from asserting it, both Scrima and INA will be harmed. Conversely, such a holding will not harm Transamerica. As Judge Bell stated in his opinion:

Analysis of the equitable considerations raises several complex issues. Scrima's failure to recognize his rights under the automatic stay affected the interests of the parties. The bankruptcy court observed that Scrima and INA each got exactly what they bargained for under their insurance policy. However, this Court notes that if Transamerica is held liable under its policy with Scrima, then it will also get exactly what it bargained for. The possibility that Scrima, while an insured, would file for bankruptcy

was implicitly part of the risk that Transamerica assumed in insuring Scrima. Transamerica's risk that an automatic stay would prevent it from cancelling insurance is a hazard that all insurers incur when they offer to sell insurance. Had Scrima fully known the legal effect of the automatic stay, presumably he would have informed Transamerica of his bankruptcy. Then Transamerica could have moved the bankruptcy court for relief from the stay and Scrima could have moved to hold Transamerica in contempt for violating the automatic stay. Without notice Transamerica was effectively prevented from seeking relief from the automatic stay. However, Transamerica has admitted, rightly or wrongly, that it *probably* would not have received relief from the automatic stay. Transamerica's position has not been prejudiced in any significant way. Assuming, as does Transamerica, that the bankruptcy court would not have removed the stay, Transamerica would have been liable on the insurance policy at the time of the fire. It's [sic] liability would have been that for which it had contracted.[32]

Transamerica argued at the trial that Scrima's former attorney, Edward Read Barton ("Barton"), was aware of Transamerica's cancellation within the 60 day period, asserting that such knowledge precluded Scrima and INA from estopping Transamerica. To coin a popular phrase, Transamerica was fixated on "what did he know, and when did he know it?" First, I do not believe that once Transamerica waived the proof of loss requirement by cancelling the policy, it could then be resurrected. Second, even if the waiver could be vitiated, I do not believe that sufficient evidence was presented at trial to hold that

---

**31.** During recross-examination by INA's attorney, Scrima was asked, "what reason was there that you didn't file the—a Proof of Loss with Transamerica?" Scrima replied: "I just didn't think they were my insurance company any longer at the time." TR at 94. Following up, INA's attorney asked: "Do you know whether you would have, financially speaking, been bet-

ter off if you filed a Proof of Loss with Transamerica within the time that was provided by the policy, assuming that the policy was in force at the time of the fire?" Scrima replied: "Yeah. Their policy was larger." TR at 94.

**32.** 103 B.R. 128 at 132–33.

the proof of loss requirement was reinstated.

In arguing that Barton knew about the cancellation within the 60 days after the fire, Transamerica focused on two time entries in Barton's fee petitions, the first on November 2, 1985,[33] for a telephone conversation with Scrima, and the second on November 5, 1985,[34] for a telephone conversation with the public adjuster. At the trial, Scrima's attorney was the first to question Barton on this issue, and asked Barton as to the first call: "I ask you if you have a recollection as to what would have been discussed and can clarify a little bit for us exactly what you are referring to with bringing in prior insurance company?" TR at 101. Barton replied: "I have no further recollection than what that entry has with respect to that topic." TR at 101–2. As to the second call, Scrima's attorney asked Barton: "Do you have any independent recollection of anything other than just what the time sheet shows?" TR at 102. Barton replied: "No, I do not." TR at 102. When cross-examined by INA's attorney, Barton reiterated that he had no independent recollection. TR at 116–7. Upon cross-examination by Transamerica's attorney, Barton was asked: "However, it's quite clear, is it not, from your documents that at the very least you knew about it by November 2nd, 1985?" TR at 126. Barton replied: "It appears that I was aware of it at that time." TR at 126. Nothing in these statements, nor in the entire record, demonstrate that within the 60 day period, Barton definitively knew 1) that the Transamerica policy had in fact been cancelled; 2) that it was cancelled by Transamerica and not by Scrima; or 3) that the cancellation took place after the automatic stay was in effect. In fact, since Barton filed a motion to hold INA in contempt when it attempted to cancel Scrima's policy,[35] it only seems logical that Barton would have done the same with regard to Transamerica if he was cognizant of all the relevant facts. Thus, Transamerica's cancellation of the Scrima policy waived the 60 day proof of loss requirement, and Transamerica is now estopped from asserting it.

## DAMAGES

■■■■ Having found that Transamerica waived the 60 day proof of loss requirement, and is now estopped from asserting it, I must decide what amounts INA and Scrima can recover. The parties stipulated to some of the damages, but others are still in dispute.

In accordance with Michigan law, I held in my opinion of November 29, 1989, that if Transamerica is liable, its liability would be determined by a pro rata formula. In other words, a three step formula is utilized: 1) add the coverage from both policies for each type of loss; 2) compute what percentage each policy contributes to that total; and 3) multiply that percentage by either the amount of the loss paid or the loss claimed, depending on whether the payment is to be made to INA or Scrima.

. The two stipulations as to Transamerica's liability are as follows. The parties stipulated that Transamerica's liability on contents is $51,962.76; no stipulation was asserted whereby that figure was broken down between INA and Scrima, but rather, the parties stated that they would divide the amount subsequent to this opinion.[36] TR at 4–5, 9. Since my opinion is actually being rendered in two parts, due to

---

**33.** This entry is two-tenths of an hour, or twelve minutes long, and states: "Telephone conference with Joe regarding problems on insurance, problems with bringing in prior insurance company and need to complete R & As and discussion as to ability to salvage part of machinery."

**34.** This entry was one-tenth of an hour, or six minutes long, and states: "Telephone conference with Public Adjuster about Friday's Hearing and problems with TransAmerica."

**35.** When INA first issued its policy to Scrima, it was in the form of a 30 day binder. At the expiration of those 30 days, INA attempted to refuse to issue the 12 month policy to Scrima.

**36.** Scrima's total loss on contents exceeded the INA policy limits, which is why he will receive the excess of the amount after INA takes its share for contribution.

INA's refusal to consent to the entering of a final order on its claim, I must compute each party's share. This is entirely possible because INA stated its share of the contents recovery at page 13 of its trial brief to be $20,483.96. Therefore, the remaining $31,478.80 is Scrima's share of Transamerica's liability on contents. As to the second stipulation, the parties agreed that the business interruption loss suffered by Scrima was $19,833.84. TR at 106. Since both insurers provided equal coverage on this type of loss, Transamerica's liability to Scrima is $9,916.92. INA has already paid $6,657.00 to Scrima in settlement of its share of the loss.

Unresolved damages covered by both policies include those to the building and damage to the property of others. In addition, Scrima is seeking consequential damages in the form of lost profits and attorney fees.

As to the building, the parties agreed that the actual cash value is $56,353.61. Transamerica argued that the $30,000.00 that Scrima received upon the sale of the real estate must be deducted from that figure to determine the actual loss.[37] The Transamerica policy issued to Scrima, which is Exhibit 1, insured the building for $100,000.00.[38] The policy defines both the term "actual cash value" and the term "replacement cost" as they relate to losses on buildings. Neither definition includes a computation of resale or market value.[39] Further, the $30,000.00 represents proceeds for the damaged building and the land. Therefore, the amount of money that Scrima received on the sale of the real estate is irrelevant to the computation of Transamerica's liability. While the loss on the building was $56,353.61, INA negotiated to pay Scrima only $42,265.21. Thus, INA may recover Transamerica's pro rata share of that amount, which is $24,860.39.[40] Scrima is to recover the difference between that sum and Transamerica's total liability on the loss, which amounts to $8,288.78.[41]

As to the loss on the property of others, INA has paid Scrima $1,007.52, thus permitting it to recover $552.51 from Transamerica.[42] Scrima's attorney stated that their additional claim against Transamerica was for approximately $6,000.00. Transamerica presented no evidence to dispute that amount. Therefore, Transamerica is liable to Scrima for $3,290.32, which repre-

---

37. Of the $30,000.00, approximately $20,000.00 went to lienholders and approximately $10,000.00 went into the bankruptcy estate.

38. Section I of the policy declarations shows that the valuation of the building is to be determined by replacement cost. However, the fire policy endorsement dictates that the loss is to be paid according to the actual cash value, not to exceed replacement cost. However, the fire policy endorsement dictates that the loss is to be paid according to the actual cash value, not to exceed replacement cost. My November 29, 1989, opinion regarding the effect of an endorsement is controlling, and thus the language of the endorsement governs.

39. At page 22, the policy states:
I. When used in the provisions applicable to Section I of this policy (including endorsements forming a part hereof):
actual cash value means replacement cost less depreciation (including obsolescence) of that part of the property sustaining loss at time and place of loss, but not exceeding the cost to repair with material of like kind and quality within a reasonable time after loss.
replacement cost means the full cost of repair or replacement at the time and place of loss without deduction for depreciation.

40. This is the sum stated by INA in its trial brief. Going through the formula, Transamerica insured the building for $100,000.00 and INA insured it for $70,000.00, thus totaling $170,000.00 of insurance. Transamerica's coverage should be divided by the total amount of coverage ($100,000.00/$170,000.00) to compute Transamerica's percentage of the risk (58.82352%), and that percentage should be multiplied by the amount of the loss that INA paid ($42,265.21). I arrived at $24,861.88, which is more precise, but I will accept INA's figure.

41. Transamerica's total liability for the loss of the building cannot exceed its pro rata share. The loss was $56,353.61, and 58.82352% of that amount is $33,149.17. Thus, if Transamerica pays $24,860.39 to INA as contribution, it can only be liable to Scrima for $8,288.78.

42. The Transamerica policy provided $85,000.00 in coverage and the INA policy provided $70,000.00 in coverage, totaling $155,000.00. Transamerica's percentage of the coverage ($85,000.00/$155,000.00) is 54.8387%. That percentage multiplied by the amount of the loss paid by INA ($1,007.52) computes to $552.51.

sents its pro rata share.[43]

Scrima has also asserted a claim against Transamerica for loss of profits. Scrima's claim is based on hypothetical lost profits for the period of time after the business interruption coverage lapsed until the date of the trial.[44] INA is not involved in this issue because Scrima executed a release in conjunction with the settlement, but Scrima's attorney agreed on the record that any recovery from Transamerica on this issue would have to be reduced by the pro rata share of INA up until the time that it paid on Scrima's claim.[45] TR at 223. Scrima's argument is divisible: first, can such a claim be sustained; and second, if so, in what amount.

Scrima's claim for lost profits is based on Transamerica's refusal to pay under the terms of what we now know is a valid contract of insurance. Transamerica first disputes the recovery of lost profits, and second, argues that if such a recovery is available, it is limited by the twelve month policy provision on business interruption loss. Several cases have been handed down in our circuit regarding such claims.

In *Salamey v. Aetna Casualty & Surety Co.*, 741 F.2d 874 (6th Cir.1984), the Sixth Circuit was faced with such a claim. The plaintiff's store had burned down in September of 1980, and in January of 1981, the defendant denied the plaintiff's claim on the basis that he was involved in the fire.[46] The insurance policy contained a provision that allowed recovery for business interruption loss, not to exceed twelve months.[47] The trial judge instructed the jury that if the defendant's failure to pay the plaintiff's claim caused the plaintiff's inability to return to business, the jury could award damages for lost profits beyond the two and one-half months covered by the business interruption loss provision through the time of trial.[48] The jury returned a verdict for the plaintiff and the defendant appealed. The Sixth Circuit first held that "[t]his claim for lost profits is separate from the claims to enforce the insurance contract." [49] Since the plaintiff was seeking damages based on the breach of the policy (the defendant's failure to pay according to the policy), [t]he business interruption clause is thus irrelevant to the measure of damages for breach of contract." [50] The Sixth Circuit went on to state that in Michigan, damages from a breach of contract are divided into two types, consequential damages arising naturally from the breach itself, and damages that were in the contemplation of the parties at the time the contract was executed.[51] Consequential damages such as lost profits are not recoverable for something that is not known to the insurer, such as a venture with a third party, but Salamey was allowed to recover lost profits where "his inability to rebuild and reopen the store resulted naturally and directly from Aetna's refusal to pay benefits for the fire loss." [52]

A year later, in *Murphy v. Cincinnati Insurance Co.*, 772 F.2d 273 (1985), the Sixth Circuit permitted the plaintiffs to recover consequential damages in the form of attorney fees, as a result of the defendant's breach of contract, because the plaintiffs were forced to litigate to enforce

---

**43.** This figure is computed by multiplying $6,000.00 by 54.8387%, as discussed in the preceding note.

**44.** Since the parties stipulated to six months of business interruption losses, any liability of Transamerica for lost profits would be computed from March 23, 1986.

**45.** The time period is from March 23, 1986, after the business loss coverage ceased, through September 27, 1987, the date the court approved the settlement between INA and Scrima.

**46.** *Salamey* at 876.

**47.** *Salamey* at 876.

**48.** *Salamey* at 876.

**49.** *Salamey* at 877.

**50.** *Salamey* at 877.

**51.** *Salamey* at 877, relying on *Kewin v. Massachusetts Mutual Life Insurance Co.*, 409 Mich. 401, 414, 295 N.W.2d 50 (1980).

**52.** *Salamey* at 877. The Sixth Circuit also indicated that while the Michigan Supreme Court had not yet expressly allowed such a recovery, several Michigan cases persuaded the panel that such a recovery would be permitted by the Michigan high court. *Salamey* at 877–78, n. 1.

the contract. The Court stated that in Michigan, an insurance company has an implied contractual duty to act in good faith in investigating and refusing to pay a claim, and thus the attorney fees were recoverable.[53] Since the Sixth Circuit upheld a case involving the award of attorney fees as consequential damages, based on a bad faith breach of contract, it raises the issue of whether Scrima has to demonstrate bad faith on the part of Transamerica before recovering consequential damages in the form of lost profits.

The Michigan case that the Sixth Circuit panels relied upon in both *Salamey* and *Murphy* is *Kewin v. Massachusetts Mutual Life Insurance Co.*, 409 Mich. 401, 295 N.W.2d 50 (1980). *Kewin* did not decide whether a finding of bad faith was needed to sustain a breach of contract action, but rather, it stated that "[t]he parties do not dispute that a cause of action in contract arises upon a bad-faith breach of a disability insurance contract."[54] Further, in dictum, the Court stated:

> In the commercial contract situation, unlike the tort and marriage contract actions, the injury which arises upon a breach is a financial one, susceptible of accurate pecuniary estimation. The wrong suffered by the plaintiff is the same, whether the breaching party acts with a completely innocent motive or in bad faith.[55]

So, in *Kewin*, the Michigan Supreme Court did not expressly decide whether bad faith is necessary to sustain a cause of action for consequential damages arising out of a breach of an insurance contract. It appeared from the language of the opinion that any breach, such as Transamerica's wrongful cancellation and continued refusal to pay on its policy, would be suffi-

cient.[56] In a case decided after *Kewin*, *Stockdale v. Jamison*, 416 Mich. 217, 224, 330 N.W.2d 389 (1982), the Michigan Supreme Court held that when an insurer breached its duty to defend, there was no need to make a finding as to good or bad faith. In reliance on the above quoted material from *Kewin*, the Court stated:

> The duty to defend, however, arises solely from the language of the insurance contract. A breach of that duty can be determined objectively, without reference to the good or bad faith of the insurer. If the insurer had an obligation to defend and failed to fulfill that obligation, then, like any other party who fails to perform its contractual obligations, it becomes liable for all foreseeable damages flowing from the breach.[57]

In that decision, I find further support for the premise that there is no absolute rule that bad faith on the part of the insurer must be shown prior to the recovery of consequential damages. While this may seem like a harsh rule, it is consistent with other decisions of the Michigan Supreme Court in which it held that where both parties are "innocent," the loss should be borne by the party that made the loss possible.[58] Further, based on the language in *Salamey*, the policy provision that limits business interruption losses to twelve months from the date of the loss are not applicable to the recovery of consequential damages.[59] Thus, as in *Salamey*, consequential damages are available through the date of trial.

Certainly, INA's initial refusal to pay, coupled with Transamerica's wrongful cancellation and continued refusal to pay, caused Scrima's inability to restore his business. As I have decided that consequential damages for lost profits are recov-

---

53. *Murphy* at 276, relying on *Kewin, supra,* note 42.

54. *Kewin,* 409 Mich. at 414, 295 N.W.2d 50.

55. *Kewin* at 420, 295 N.W.2d 50.

56. In addition, Transamerica's breach might be viewed as approaching bad faith, as Judge Bell stated, "Transamerica's cancellation was ignorant misfeasance, whereas Scrima's failure to

notify was ignorant nonfeasance." 103 B.R. at 133.

57. 416 Mich. at 224, 330 N.W.2d 389.

58. *See, e.g., Etherington v. Bailiff,* 334 Mich. 543, 55 N.W.2d 86 (1952); *Rossman v. Hutchinson,* 289 Mich. 577, 286 N.W. 835 (1939); *Peake v. Thomas,* 39 Mich. 584 (1878).

59. See note 50, *supra.*

erable, without any time limitations, I must now decide the amount that Scrima lost as a result of Transamerica's conduct.

Scrima testified at the trial that he had been in the shoe business for almost 25 years prior to the fire. TR at 31. He also testified that his bankruptcy filing was precipitated by an Internal Revenue Service lien for unpaid taxes and some business debts with suppliers, although immediately preceding the bankruptcy filing the business had started to improve. TR at 36–9, 84–6. Scrima's federal income tax returns for 1983 through 1989, including his profit/loss schedules, were admitted as Exhibits 9 through 15. Scrima also testified that as of the date of trial, he had a net income for 1990 of approximately $500.00. TR at 55. Scrima's profit/loss schedules reveal the following information:

1983—Net profit of $26,861.00
1984—Net profit of $28,126.00
1985—Net loss of $53,859.00
1986—Net loss of $2,655.00
1987—Net profit of $532.00
1988—Net loss of $6,377.00
1989—Net loss of $508.00

The leap from a $28,126.00 net profit in 1984 to a net loss in 1985 of $53,859.00 is explained primarily by the fire. The profit/loss schedule permits the value of inventory remaining at the end of the year to be subtracted from a figure that is a combination of the year's beginning inventory, purchases throughout the year, materials and supplies, and other costs. That end result, which is referred to as the cost of goods sold, is then subtracted from gross sales, resulting in the taxpayer's gross income. Gross income is further reduced by any allowable deductions, resulting in a net profit or net loss. Due to the fire, Scrima had a year-end inventory in 1985 of $290.00, as opposed to $71,862.00 in 1983 and $72,962.00 in 1984. Thus, in 1985, his overall computations were dramatically different, resulting in a swing of $81,985.00 from 1984.

Since Scrima showed a net profit in both 1983 and 1984, and probably would have posted a net profit in 1985 but for the destruction of his inventory by the fire, he did suffer a loss of profits due to the failure of the insurance companies to promptly reimburse him for his losses. By averaging the net profits from 1983 and 1984, a figure of $27,493.50 represents Scrima's projected yearly net profit, which computes to $2,291.12 per month or $75.32 per day.

Scrima is seeking lost profits from March 23, 1986, which is the day after the business interruption loss coverage ceased by virtue of stipulation of the parties, through April 24, 1990, the date of trial. That encompasses exactly four years and one month. In computing Transamerica's liability, INA's delay in payment must be factored in. Since there are no provisions in either policy regarding amounts of coverage for consequential damages, INA and Transamerica are equally responsible for the period from March 23, 1986, through September 27, 1987, which is the date INA settled its claim with Scrima. Therefore, for that 18 month and 4 day period, Transamerica's liability totals $20,770.72. From September 28, 1987, through April 24, 1990, Transamerica's liability totals $70,692.04. The total of those two sums is $91,462.76, but it must be reduced by the $532.00 net profit that Scrima posted in 1987. Thus, Transamerica's liability to Scrima for lost profits is $90,930.76.

In addition to lost profits, Scrima asserts a claim for attorney fees as a further measure of consequential damages. This is similar to the attorney fees awarded in *Murphy*, which were granted for the necessity of litigating the breach of contract action. The Sixth Circuit upheld the District Court's award of attorney fees, and this appears to support Scrima's assertion. However, a review of the District Court opinion demonstrates that such an award in this case would be inappropriate:

> The question remaining is whether the attorney fees requested by the plaintiffs are a proper measure of the damages arising from the breach. The normal test applied to contract damages is whether the damages arise naturally from the breach of the contract itself. *Frederick v. Hillebrand*, 199 Mich. 333,

341, 165 N.W. 810 (1917). In this case, the failure to investigate the claim "fairly and reasonably" caused the plaintiffs to incur the expense of this litigation to enforce their rights under the contract.

This is not to say that any time an insured has to resort to the legal system and is successful that attorney fees may be recovered. This Court holds only that attorney fees are a reasonable measure of the damages for breach of the duty to act in good faith and, absent a specific finding of such a breach, there is no basis for an award of attorney fees.[60] In that case, the attorney fees were awarded because the insurance company acted in bad faith. Absent such a finding, such an award is improper. As there has been no finding of bad faith as to Transamerica's conduct in regard to Scrima, an award of attorney fees would be inappropriate.

### CONCLUSION

For the reasons stated in this opinion, I find that Transamerica's cancellation of Scrima's policy waived the 60 day proof of loss requirement, and that Transamerica is now estopped from asserting such a requirement. As to INA, upon report and recommendation, I find Transamerica liable in the amount of $45,896.86.[61] As to Scrima, as a final order, I find Transamerica liable in the amount of $90,930.76 for lost profits. In addition, on the policy, Transamerica is liable to Scrima for $52,974.82. According to Mich.Comp.Laws § 500.2006, Scrima is entitled to 12% per annum interest on that amount,[62] which amounts to a total policy liability of $82,806.15 [63], and an overall liability of $173,736.91.

### ORDER

An Opinion concerning the claims of the Debtors against Transamerica Insurance Company having been rendered, therefore in consideration of that Opinion,

IT IS ORDERED THAT:

1. The text of the Opinion is incorporated herein by reference and made a part hereof.

2. Transamerica's cancellation of the Debtors' insurance policy waived the 60 day proof of loss requirement, and as a result, Transamerica is now estopped from asserting that requirement as a bar to the Debtors' claims.

3. Transamerica is liable to the Debtors for $54,974.82 in policy coverage, plus 12% per annum interest, totalling $82,806.15.

4. Transamerica is liable to the Debtors for $90,930.76 in lost profits.

5. Transamerica's total liability to the Debtors amounts to $173,736.91.

6. A copy of this Order, together with a copy of the Opinion, shall be served upon David L. Conklin, Attorney for Debtors–Plaintiffs, Jonathan S. Damon, Attorney for Defendant Transamerica Insurance Company, and Lawrence Mulligan, Attorney for Defendant Insurance Company of North America.

---

**60.** *Murphy v. Cincinnati Insurance Company,* 576 F.Supp. 542, 544 (E.D.Mich.1983).

**61.** At page 14 of its trial brief, INA stated: "In addition, INA seeks recovery of 12% UTPA interest as provided in MCL 500.2006 and statutory interest." No other supporting arguments were provided. Since it is unclear to this Court if INA can utilize Mich.Comp.Laws § 500.2006 or any other provision, this issue is reserved, and INA may bring an appropriate motion with supporting legal arguments within 15 days of the date of this opinion.

**62.** The statute provides that the interest begins to accrue sixty days after proofs of loss have been filed. Scrima filed his proofs of loss with Transamerica on March 16, 1986, so the 12% per annum interest accrued from May 16, 1986 through April 24, 1990.

**63.** The interest has been compounded annually.