810 F.2d 594
 55 USLW 2511, 22 Fed. R. Evid. Serv. 697
 Daniel BARNIER, Plaintiff,
Marie Barnier, Plaintiff-Appellee, Cross-Appellant,
v.
William SZENTMIKLOSI, Peter Campbell, City of Milan Police
Department, and City of Milan,
Defendants-Appellants, Cross-Appellees.
 Nos. 83-1265, 83-1311.
 United States Court of Appeals,
Sixth Circuit.
 Argued Sept. 29, 1986.
Decided Feb. 10, 1987.
 
 John B. Collins, Collins and McCormick, Ypsilanti, Mich., Michael McCormick, argued, for defendants-appellants, cross-appellees.
 James A. Evashevski, Hooper, Hathaway, Price, Beuche and Wallace, Ann Arbor, Mich., David J. Hutchinson, Lead Counsel, Bruce T. Wallace, Robert Southard, argued, for plaintiff-appellee, cross-appellant.
 Before KEITH and WELLFORD, Circuit Judges, and TODD, District Judge.*
 WELLFORD, Circuit Judge.
 
 
 1
 Defendants, police officers Szentmiklosi and Campbell, the police department, and the City of Milan, Michigan, appeal a malicious prosecution judgment in favor of plaintiff, Marie Barnier, on two grounds: (1) erroneous admission of a polygraph test, and (2) insufficient evidence to support the verdict. Barnier cross-appeals, challenging the district court's denial of treble damages against the City on her malicious prosecution claim and the district court's dismissal of her Sec. 1983 claim. We hold that the admission of the polygraph test was reversible error and therefore REVERSE and REMAND for a new trial on the state law malicious prosecution claim. In all other respects, we AFFIRM the district court judgment.
 
 I.
 
 2
 In the early morning hours of May 30, 1981, appellants, two Milan police officers, were pursuing a suspect for driving while intoxicated, Timothy Barnier, son of plaintiff. Timothy was attempting to evade police and finally stopped at his parents' home.
 
 
 3
 According to Mr. and Mrs. Barnier, they were awakened by police car sirens and flashing lights. The couple ran to the front yard in sleepwear to discover the police officers wrestling with their son, and Mrs. Barnier believed one officer was choking her son. Mrs. Barnier then intervened and grabbed the arm of the officer who she believed was "choking" her son. She testified that she only held the officer's arm for a minute or so despite the officer's warning to "get away." Mr. Barnier testified that he never touched either officer, and his wife denied that she made any additional physical contact with either officer. The Barniers also claimed that the police officers pushed Mrs. Barnier, chased both of them into the house, and tried to knock down the door.
 
 
 4
 The officers' version was entirely different. They testified that they had to engage in a "wrestling" match to subdue Timothy and eventually resorted to a chokehold. The officers claimed that when Timothy's parents came out of the house, the Barniers grabbed and pulled on them, struck at them in the back, and generally interfered with their attempts to effect Timothy's arrest. One officer claimed that Mr. Barnier struck him in the face.
 
 
 5
 The officers subsequently prepared a report stating their version of the circumstances surrounding Timothy's arrest. The officers concluded: "Officers will seek a two count warrant on each subject [parents] for Assault on Police officer and Interfering with arrest from the county prosecutors [sic] office." This report was submitted to their superiors for review, but the defendant officers testified that they had no further knowledge of subsequent events in respect to action against the Barniers.
 
 
 6
 Based on the officers' report, the prosecutor's office issued a criminal complaint charging the Barniers with criminal assault and battery, a maximum ninety day misdemeanor offense. A summons was then mailed to the Barniers to give notice of a court appearance on the charge. Prior to that hearing, the local newspaper mentioned a hearing with respect to an alleged assault and battery at the Barniers' address, but did not mention their name. The Barniers made the required appearance and later claimed that the presence of several acquaintances at the hearing embarrassed them.
 
 
 7
 On the advice of their counsel, the Barniers took a lie detector test, apparently to encourage the prosecution to dismiss the charges. Defendants and defense counsel knew nothing about the lie detector test. Meanwhile, Timothy pleaded no contest to the DWI charge. The Barniers attended three other hearings during the next two months before the judge dismissed the complaint on the prosecutor's motion.
 
 
 8
 Mr. and Mrs. Barnier and son Timothy then filed suit based on a Sec. 1983 claim for alleged deprivations under the due process and equal protection clauses as well as eighth amendment violations. Plaintiff and her family also raised numerous pendent state law claims for assault and battery, malicious destruction of private property, false arrest, malicious prosecution, and intentional infliction of emotional distress.
 
 
 9
 At trial the district court directed a verdict in defendants' favor on the Sec. 1983 claims in a published opinion. See Barnier v. Szentmiklosi, 565 F.Supp. 869 (E.D.Mich.1983). The only state claims submitted to the jury concerned the charges of assault and battery, false arrest, and malicious prosecution. The jury returned a verdict in Mrs. Barnier's favor only on the malicious prosecution claim, awarding her $5,500.00 compensatory damages against the City. Because of a Michigan statute, the district judge trebled the damages award against the remaining individual defendants. The judge declined, however, to treble the damages award against the City. The jury verdict was in favor of defendants on all other claims.
 
 II.
 
 10
 Defendants' first assignment of error concerns the trial court's admission of evidence that the Barniers took a lie detector test. Plaintiffs asserted that taking the test was emotionally stressful, and they purported to introduce evidence of the polygraph test only for the purpose of showing damages. The district court admitted the evidence, limiting its use to the damages issue.
 
 
 11
 Generally, the use of polygraph results to prove a party's innocence is prohibited. See, e.g., United States v. Murray, 784 F.2d 188 (6th Cir.1986); Poole v. Perini, 659 F.2d 730, 735 (6th Cir.1981), cert. denied, 455 U.S. 910, 102 S.Ct. 1259, 71 L.Ed.2d 450 (1982). Under certain limited circumstances, however, the fact that such a test was taken may be relevant and admissible for purposes other than establishing the truth or falsity of a disputed fact. See Murphy v. Cincinnati Ins. Co., 772 F.2d 273 (6th Cir.1985) (insured's willingness to take lie detector test admissible for the limited purpose of showing insurer's bad faith in denying insured's claim). Under the circumstances of this case, we conclude that the district court's admission of evidence that the Barniers took a lie detector test was reversible error. The manner in which the evidence was introduced was prejudicial because it allowed, if not encouraged, the jury to draw improper inferences from the evidence.
 
 
 12
 Immediately following Mr. Barnier's testimony describing the test, his attorney asked:
 
 
 13
 Q. All right, at some point after this test, did you go back to court?
 
 
 14
 A. Yes, I did.
 
 
 15
 Q. Okay, and what happened to the charges against you and your wife?
 
 
 16
 A. The charges was dropped against me and the wife....
 
 
 17
 Similarly, immediately following Mrs. Barnier's description of taking the lie detector test, her attorney asked:
 
 
 18
 Q. Back to the criminal charges now, were those eventually dismissed?
 
 
 19
 A. Yes, they were.
 
 
 20
 Once again, in cross-examining the prosecutor, the Barniers' attorney asked:
 
 
 21
 Q. You're aware that a lie detector test was taken by Dan Barnier and Marie Barnier?
 
 
 22
 A. That's correct.
 
 
 23
 Q. You say you dismissed the case. In fact ... the Honorable Ken Bronson dismissed the case, did he not?
 
 
 24
 A. I made a motion to dismiss; it was ... based on my motion to dismiss....
 
 
 25
 This repetitive line of questioning clearly gave rise to the inference that the prosecutor dropped the charges because of the results of the lie detector test. More importantly, this testimony implied that the test demonstrated that the Barniers' story was true. Using evidence of a lie detector test in this manner with the effect of bolstering the Barniers' credibility was highly prejudicial, particularly since the entire case hinged on whether the jury believed the Barniers' version of the facts and the burden cast was on plaintiff. The verdicts rendered for defendants on other claims of misconduct and wrongful activity arising out of the confrontation in controversy indicate that the version of events claimed by plaintiff and her family were not otherwise accepted by the jury.
 
 
 26
 The purported use of this evidence for the purpose of showing damages was dubious at best, because the Barniers voluntarily submitted to the polygraph test at the advice of their own counsel, not at the request of the prosecution or these defendants. Defendants and their counsel did not even know the test was being taken, let alone encourage or agree to a polygraph test. We doubt that the Barniers would volunteer to take the test unless for the purpose of reporting its results to the prosecutor if the results were deemed by their attorney to be favorable. If unfavorable, presumably the results would not have been revealed. To claim that defendants were somehow responsible for the emotional stress the test caused them under these circumstances is questionable in our view. We have difficulty seeing the causation between the voluntary submission to the test and any damages attributable to defendants. In sum, we doubt that the evidence of the polygraph was properly admissible for any purpose, and the repeated line of questioning implying that the polygraph supported the Barniers' credibility far outweighed in prejudice the dubious probative value on the damages issue. The district court should not have admitted this evidence under Federal Rule of Evidence 403. See United States v. Ridling, 350 F.Supp. 90, 95 (E.D.Mich.1972) ("The Court must always be alert to prevent the use of evidence that has marginal utility in the process of truth seeking if it is of such a nature so as to over-impress the jury.")
 
 
 27
 With respect to defendants' second assignment of error, we find the evidence sufficient to support a jury verdict in favor of the Barniers on the malicious prosecution charge, and to support the judgment for defendants on all the other charges.
 
 III.
 
 28
 Mrs. Barnier has also raised several assignments of error on her cross-appeal. Plaintiff's first assignment of error concerns the issue of treble damages. After the jury rendered a favorable verdict on plaintiff's malicious prosecution claim, plaintiff moved for treble damages pursuant to Mich.Comp.Laws Sec. 600.2907. The district judge granted this motion in part, allowing treble damages as to the individual defendants only, but not against the municipal defendants. The district court determined that the City of Milan did not "for vexation and trouble or maliciously, cause or procure any other to be arrested, attached, or in any way proceeded against." Mich.Comp.Laws Sec. 600.2907.[1] The court concluded that the statute was intended to apply to persons who were the actual wrongdoers. Because the City of Milan could only be liable vicariously for the actions of its employees, treble damages were not appropriate against the City.
 
 
 29
 No Michigan court has expressly decided whether a municipal employer can be held liable for treble damages when its liability is founded solely on respondeat superior. In determining whether treble damages against the municipality are appropriate, we look to the statute and its purposes.
 
 
 30
 The Michigan Court of Appeals recently held that the treble damages provision in this statute is intended to punish a defendant rather than to compensate a plaintiff. See Camaj v. S.S. Kresge Co., 143 Mich.App. 604, 372 N.W.2d 359 (1985), rev'd on other grounds, 426 Mich. 281, 393 N.W.2d 875 (Mich.1986). Camaj, however, cited cases holding that the treble damages provision was compensatory in purpose. See 143 Mich.App. at 606, 372 N.W.2d at 360. Regardless of whether the purpose is punitive or compensatory we find no error in the result reached by the district judge, an experienced Michigan jurist.
 
 
 31
 If the purpose of the treble damage provision is to provide exemplary damages, the well-reasoned majority view prohibits courts from imposing punitive damages on a governmental body for the act of one of its agents or employees. See Newport v. Fact Concerts, Inc., 453 U.S. 247, 260, 101 S.Ct. 2748, 2756, 69 L.Ed.2d 616 (1981) (municipalities not liable for punitive damages under Sec. 1983) ("Judicial disinclination to award punitive damages against a municipality has persisted to the present day in the vast majority of jurisdictions."). See also J. Ghiardi & J. Kircher, Punitive Damages: Law and Practice, Sec. 5.13 (1985).
 
 
 32
 In Newport the Supreme Court explained the policy reasons disfavoring municipal liability for punitive damages. See 453 U.S. at 263, 266-71, 101 S.Ct. at 2759. First, punitive damages are designed to punish the wrongdoer. Assessing these damages against the municipality rather than the offending official punishes the wrong party. Id. at 267, 101 S.Ct. at 2757, 2759-62. Here the municipality is not the wrongdoer. "Damages awarded for punitive purposes, therefore, are not sensibly assessed against the governmental entity itself. To the extent that the purposes of Sec. 1983 have any bearing on this punitive rationale, they do not alter our analysis." 453 U.S. at 267, 101 S.Ct. at 2760.
 
 
 33
 Second, punitive damages are intended to deter wrongdoing. Treble damages against the City miss the mark. The individual police officer is not likely to be deterred by the knowledge that punitive damages could be assessed against the municipality by reason of his excessive or wrongful activity. Assessing damages against the offending official is a more direct and effective means of deterrence. Id. at 268-69, 101 S.Ct. at 2760. In addition, imposing punitive damages on municipalities may create a serious risk to the municipalities' financial integrity. Id. at 270-71, 101 S.Ct. at 2761-62. Imposing punitive damages potentially results in a windfall to the complaining party and may have a substantial impact on the local treasury, and, consequently, on services available to the public. Id.
 
 
 34
 Even if the treble damages imposition were deemed compensatory in purpose, a reasonable statutory construction would permit us to affirm. As the district court noted, the statute's focus is on the wrongdoer who actually caused the injury. Thus when a municipality is vicariously and not directly liable for the injury, the municipality is not one who "cause[d] or procure[d]" the malicious prosecution. See Mich.Comp.Laws Sec. 600.2907. The district court, therefore, properly refused to treble the damages with respect to the municipality.
 
 IV.
 
 35
 The final argument advanced by plaintiff (and amicus curiae) is the alleged erroneous dismissal of plaintiff's Sec. 1983 claims. As a threshold matter, we note that plaintiff did not allege or demonstrate any practice or custom on the part of the City of Milan or its police department with respect to any of the individual officers' actions. A Sec. 1983 action is therefore unavailable against the City, because "the touchstone of a Sec. 1983 action against a government body is an allegation that official policy is responsible for a deprivation of [constitutional] rights." Monell v. New York City Dept. of Social Services, 436 U.S. 658, 690, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). A municipality cannot be held liable under Sec. 1983 on a respondeat superior theory. Id. at 691, 98 S.Ct. at 2036. "The 'official policy' requirement [of Monell ] was intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." Pembaur v. City of Cincinnati, --- U.S. ----, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986) (emphasis in original).
 
 
 36
 Moreover, we hold that on the basis of the rationale expressed by the district court, and by virtue of Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), and Hudson v. Palmer, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), the district court properly dismissed the Sec. 1983 claims under the circumstances of this case.
 
 
 37
 The conduct of the defendant City of Milan, in any event, being "once removed" from the alleged "on the scene" malicious action of the police officers, and being negligent at most, does not rise to any claim of municipal conduct that "shocks the conscience." Insofar as the actions of the police officers are concerned, being involved in an altercation with parents who sought to intervene in the arrest of their son, they were vindicated by the triers of fact against plaintiffs' charges of assault and battery and false arrest. That they submitted in their official report a different and later questioned and controverted version of facts and circumstances, deemed by the city prosecutor to be a basis for a misdemeanor prosecution, would also not be the kind of conduct that would "shock the conscience" with regard to the due process and malicious prosecution claims of the Barniers.
 
 
 38
 In addition, the rationale of this court expressed in the recent Wilson v. Beebe decision, 770 F.2d 578 (6th Cir.1985) (en banc), supports the district court's decision. We decline the invitation of plaintiff and amicus curiae to create a constitutional requirement that the City prosecutors conduct a hearing before pursuing a misdemeanor charge. Such a requirement would be especially inappropriate on these facts. The charge was based on what appeared to be reasonable cause information submitted in formal reports by police officers who arrested a DWI suspect, who subsequently in substance admitted the charge of being intoxicated. Furthermore, plaintiff has not shown that no adequate postdeprivation state remedy was available in the event the officers who made the report were later determined to be malicious in implicating plaintiff in a misdemeanor offense.
 
 
 39
 Accordingly, we REVERSE and REMAND for further proceedings the judgment for plaintiff on the malicious prosecution claim. In all other respects, judgment for defendants is AFFIRMED.
 
 
 40
 KEITH, Circuit Judge, concurring.
 
 
 41
 Though I concur with the result in this case, I cannot agree completely with the majority opinion's treatment of Mrs. Barnier's Sec. 1983 claim. In my dissent to the recent decision Wilson v. Beebe, 770 F.2d 578 (6th Cir.1985) (en banc) (Keith, J., concurring in part, dissenting in part), I stated:
 
 
 42
 For some time now concerns have been expressed throughout the federal courts about Section 1983 actions transforming the fourteenth amendment into "a font of tort law to be superimposed upon whatever system may already be administered by the States" or the frivolous case "trivializing the right of action provided in Sec. 1983." Notwithstanding these sincere concerns, it strikes me that it has long been settled that "Congress has the power to enforce provisions of the Fourteenth Amendment against those who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it."
 
 
 43
 Wilson, 770 F.2d at 591 (citations omitted).
 
 
 44
 With respect to the individual police officers, I am of the view that a cognizable claim of misuse of the "badge of authority" could have been made out against them were it not for the adequacy of the state law remedy. Neither Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1980, 68 L.Ed.2d 420 (1981), Hudson v. Palmer, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) nor Wilson v. Beebe would impede such a view. In Parratt v. Taylor, the Supreme Court held that negligent conduct which results in the deprivation of property without adequate procedural due process is not actionable under Sec. 1983. Similarly, in Hudson v. Palmer, the Court made Sec. 1983 relief unavailable for intentional conduct resulting in deprivations of property without adequate procedural due process. Justices Blackmun and White believed that Parratt did not apply to deprivations of life and liberty. Parratt 451 U.S. at 545, 101 S.Ct. at 1918 (White, Blackmun, J.J., concurring). This circuit disagreed in Wilson, stating that:
 
 
 45
 Though Parratt v. Taylor concerned the loss of property, we see nothing in its underlying rationale which would require a different treatment of due process claims for deprivation of liberty.
 
 
 46
 770 F.2d at 584.
 
 
 47
 While I continue to maintain that the Wilson holding is an overly restrictive, even niggardly construction of the protections provided by Sec. 1983, I believe that there are some limits to Wilson's reach. Wilson removed from Sec. 1983's ambit "random and unauthorized acts" which deprived a person of liberty given an adequate, post-deprivation state remedy. Wilson, 770 F.2d at 584. Wilson did not, however, require a plaintiff intentionally deprived of his liberty pursuant to an established procedure to pursue a remedy other than that provided by Sec. 1983. In fact, the facts of Wilson necessarily limit the case to negligent deprivations of liberty through random and unauthorized acts.[1]
 
 
 48
 In the instant case, the individual police officers intentionally committed the act which deprived the Barniers of their liberty, namely the filing of an assault and battery charge so unwarranted that the district court jury found the officers guilty of malicious prosecution. Negligence was not an issue. Moreover, the act may have been pursuant to an established procedure in Milan of permitting police officers to file charges against citizens with little more than what appears to be cursory review by the local prosecutor's office. If such a procedure could be proven, the acts of the police officers cannot be characterized as "random and unauthorized." As Justice Blackmun noted in Parratt:
 
 
 49
 While the "random and unauthorized" nature of negligent acts by state employees makes it difficult for the State to "provide a meaningful hearing before the deprivation takes place" .. it is rare that the same can be said of intentional acts by state employees. When it is possible for a state to institute procedures to contain and direct the intentional actions of its officials, it should be required, as a matter of due process, to do so.
 
 
 50
 451 U.S. at 545, 101 S.Ct. at 1918.
 
 
 51
 It would appear to me, then, without analyzing the availability of state law remedies, that Mrs. Barnier's claim was eligible for Sec. 1983 relief.
 
 
 52
 I raise these points out of a deep apprehension that Sec. 1983 is being eroded, slowly but surely, as a bulwark against unlawful governmental action. To deny a plaintiff Sec. 1983 relief because of the adequacy of a state remedy is certainly in keeping with the purposes of the statute and to that extent, I concur with Judge Wellford's opinion. However, to remove at the outset of one's analysis liberty, property and substantive due process interests from Sec. 1983's protection, regardless of whether there is an adequate state remedy or not, is to cut away at the very core values Sec. 1983 is designed to protect. If courts are concerned about a supposed "flood" of Sec. 1983 actions intruding on federal dockets, then the proper recourse should be an evaluation of the availability of state remedies, not wholesale elimination of entire classes of actions from Sec. 1983 coverage. Much like throwing the baby out with the bathwater, we risk the gutting of Sec. 1983 in an overzealous pursuit of judicial efficiency. Yet, with the adequacy of the state law remedy as an existing limit on Sec. 1983, we risk that outcome unnecessarily.
 
 
 53
 With these reservations, I concur in Judge WELLFORD's opinion.
 
 
 
 *
 The Honorable James D. Todd, United States District Court for the Western District of Tennessee, sitting by designation
 
 
 [1]
 The statute provides:
 Every person who shall, for vexation and trouble or maliciously, cause or procure any other to be arrested, attached, or in any way proceeded against, by any process or civil or criminal action, or in any other manner prescribed by law, to answer to the suit or prosecution of any person, without the consent of such person, or where there is no such person known, shall be liable to the person so arrested, attached or proceeded against, in treble the amount of the damages and expenses which, by any verdict, shall be found to have been sustained and incurred by him; and shall be liable to the person in whose name such arrest or proceeding was had in the sum of $200.00 damages, and shall be deemed guilty of a misdemeanor, punishable on conviction by imprisonment in the county jail for a term not exceeding 6 months.
 Mich.Comp.Laws Sec. 600.2907.
 
 
 [1]
 In Wilson, the Sec. 1983 defendant police officer arrested the plaintiff and, while holding his cocked revolver in one hand, attempted to handcuff him. During the procedure, the revolver accidently discharged into the plaintiff's back, causing grevious injury to the plaintiff