**Colleen MANETTA, Plaintiff,**

v.

**COUNTY OF MACOMB, et al. and Eric Kaiser, Defendants.**

**Albert SWIECZKOWSKI, Plaintiff,**

v.

**Eric KAISER, Individually and in his Official Capacity, Curtis Schram, Individually and in his Official Capacity, Jointly and Severally, Defendants.**

Nos. 95–CV–76267, 95–CV–75919.

United States District Court,
E.D. Michigan,
Southern Division.

Feb. 12, 1997.

Edward Servitto, Warren, MI, for plaintiff.

Arthur Garton, Warren, MI, Frank Brochert, Detroit, MI, Margaret Nelson, Lansing, MI, for defendants.

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

Plaintiff Colleen Manetta commenced her case on February 21, 1995 in Macomb County Circuit Court. Thereafter, her case was removed to federal district court and assigned to Judge LaPlata. Meanwhile, on November 3, 1995, Manetta's then fiancee, Plaintiff Albert Swieczkowski, also commenced an action in Macomb County Circuit Court based on the same facts as Manetta's claim. Similarly, his case was removed to federal district court, although the case assigned to this Court. Due to Judge LaPlata's retirement, and the fact that Manetta and Swieczkowski's cases arise from the same facts, their cases have been combined, and Manetta's case re-assigned to the Court. These matters are presently before the Court on Motions for Summary Judgment filed by various Defendants.

In its current posture, Manetta's case involves 42 U.S.C. § 1983 claims against Macomb County and Macomb County Assistant

Prosecutor Eric Kaiser, individually and in his official capacity.[1] Macomb and Kaiser have moved for summary judgment. As for Swieczkowski, his case consists of, at this time, state tort claims and § 1983 claims against both Kaiser and Schram—each of whom have moved for summary judgment.

## II. FACTUAL BACKGROUND

In November 1993, Manetta resigned from her job with Karam Brothers, Inc. allegedly because of continuing sexual harassment. Immediately after her resignation, Manetta and Swieczkowski sought counsel to pursue a sexual harassment claim on her behalf. In a telephone conversation the following day, Manetta and Swieczkowski advised Ray Karam, owner of Karam Brothers, Inc., of the intended claim and that they had contacted an attorney. Karam offered to engage in settlement discussions.

Subsequently, Karam sought the assistance of the Michigan State Police to investigate the manner in which Manetta and Swieczkowski were settling her claim. Specifically, Karam presented the police with a tape of a conversation between him and Swieczkowski, and claimed that he had been advised that his family would learn of a previous affair between him and Manetta if her sexual harassment claim was not settled. The tape Karam provided to the police, however, did not contain any audible reference from Manetta or Swieczkowski regarding their intent to disclose the affair.

The Michigan State Police assigned the case to Detective Schram, who provided Karam with recording equipment which he used to record 8 conversations between himself and either or both Manetta and Swieczkowski. In particular, Schram advised Karam to try to elicit statements from Manetta and Swieczkowski regarding disclosure of information to his family. None of the conversations that were eventually taped contain threats to disclose the affair

to Karam's family. In fact, the tapes contain numerous references from Manetta and Swieczkowski regarding attorneys' handling settlement negotiations.

Around November 23, 1993, Schram allegedly advised Kaiser of his investigation and provided him with tape recordings of the conversations. Thereafter, Kaiser and Schram instructed Karam to advise Manetta and Swieczkowski that he did not want attorneys directly involved in the settlement.

Independent of the unsupported allegations of Karam, neither Kaiser nor Schram had any evidence of any criminal activity by Manetta and Swieczkowski and, to the contrary, they had an abundance of evidence that Manetta and Swieczkowski were simply negotiating a settlement of a sexual harassment claim—albeit one which had not been filed, despite their assertions to the contrary, and one for which Manetta and Swieczkowski apparently refused to disclose their lawyer's name.

Karam and Manetta eventually reached a purported settlement agreement regarding her sexual harassment claim. Thus, Kaiser drew up a release which would evidence the alleged crime and which Karam would provide to Manetta at a settlement meeting that he would arrange. Next, Kaiser and Schram arranged for COMET (County of Macomb Enforcement Team) to monitor and videotape the meeting and to provide the funds which were to constitute the settlement.

At the December 1, 1993 settlement meeting in the parking lot of a restaurant in Shelby Township, Manetta signed the release, in exchange for what apparently was supposed to be $100,000, and was, in fact, only $40,000. After the money was exchanged, Karam drove away and Manetta and Swieczkowski were immediately arrested by undercover agents acting without arrest warrants. Arrest warrants, however, were issued the next day charging Manetta and

---

1. On November 21, 1996, the Court conducted a scheduling conference on this matter. At this conference, the Court instructed Manetta's counsel to file a stipulated order dismissing Schram from Manetta's case because Manetta had never served Schram and Schram's counsel had never entered an appearance in Manetta's case. Al-

though this order has yet to be filed, the Court notes that regardless Schram is not properly a party to Manetta's case. Moreover, at the Final Pre–Trial Conference on this matter, Plaintiff Manetta indicated to the Court that she was dismissing her claim against Macomb.

Swieczkowski with extortion. Schram was the complaining witness on the warrant applications.

Incident to the arrest, officers searched Swieczkowski and found a firearm on his person. It was later determined that he was a Reserve Deputy of the Macomb County Sheriffs' Department, Reserve Mounted Division and as such was licensed to carry a firearm. Moreover, prior to the preliminary examination, Kaiser and Schram were informed that Manetta and Swieczkowski had been in contact with the law offices of Roy Gruenberg regarding the sexual harassment claim.

After the preliminary examination in Spring 1994, Judge Herman Campbell of the 41–A District Court dismissed all charges against Manetta and Swieczkowski related to these events. On February 24 and November 3 of 1995, respectively, Manetta and Swieczkowski commenced the instant actions.

## III. *ANALYSIS*

### A. *The Standards Applicable to Motions for Summary Judgment.*

Kaiser has, with respect to Swieczkowski's claims, moved for dismissal, or in the alternative, for summary judgment, based on his contention that Swieczkowski has neither set forth legally sufficient allegations nor pointed to evidence raising a genuine issue of material fact with respect to his claimed violations. Because Kaiser, and in turn this Court, have referred to materials beyond the pleadings— namely the arrest warrants and the mixed question of law and fact regarding the existence of probable cause—Kaiser's motion to dismiss will be treated as seeking summary judgment and decided with the other pending summary judgment motions.

The relevant Federal Rule holds that summary judgment is proper " 'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law.' " Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[2] According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as follows:

> * Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

> * The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

> * The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

---

**2.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A C. Wright, A. Miller, M. Kane, *Federal Practice & Procedure*, § 2727, at 35 (1996 Supp.).

\* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

\* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989). *See also, Nernberg v. Pearce*, 35 F.3d 247, 249 (6th Cir.1994).

## B. *The § 1983 Claims.*

### 1. *Manetta's Claims Against Macomb County.*

■ In deciding a prior Motion for Judgment on the Pleadings in Manetta's case, Judge LaPlata stated the following:

> [T]he Court concludes that [Manetta] has alleged the necessary elements to sustain her § 1983 claim against the County. However, had this Motion been one for summary judgment, Plaintiff's claim would not have survived for Plaintiff has not come forth with a specific policy or practice relied upon.

Accordingly, Defendant Macomb County has now moved for summary judgment, arguing that there is no material issue of fact regarding her § 1983 claim. Specifically, Macomb contends that Manetta cannot maintain a § 1983 action against it since she has not demonstrated a specific Macomb County policy or practice pursuant to which she was injured. In its Response, Manetta does not dispute this argument.

It is well-established that, in order to survive a motion for summary judgment, a plaintiff bringing a § 1983 claim against a municipality must allege or demonstrate a municipal practice, custom, or policy which is a source of the plaintiff's injury. *See, e.g., Barnier v. Szentmiklosi*, 810 F.2d 594 (6th Cir.1987); *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978) ("the touchstone of a § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of constitutional rights" (citations omitted)). From a plain reading of Manetta's Complaint and an examination of the pleadings and exhibits, it is obvious that she cannot maintain her § 1983 claim against Macomb County. Nowhere in her Complaint, or in any of her pleadings or exhibits, does Manetta allege or demonstrate a County practice, custom, or policy which caused her to suffer her alleged injuries. Indeed, by not even responding to these issues in her Response, Manetta has essentially conceded this point. Moreover, as noted, at the Final Pre-Trial Conference, Manetta's counsel informed the Court that he and Macomb's counsel had agreed that this claim would be dismissed. Accordingly, the Court will grant Macomb's Motion for Summary Judgment, as there exists no genuine issue of material fact, and Macomb is otherwise entitled to judgment as a matter of law.

### 2. *Manetta and Swieczkowski's § 1983 Claims.*

In his Complaint, Swieczkowski alleges that his arrest and prosecution, in which Kaiser and Schram actively participated, violated his First, Fourth, Fifth, and Fourteenth Amendment rights because there was no reasonable basis or probable cause to believe that he had committed a crime. Similarly, in her Complaint, Manetta asserts that, by virtue of the investigation, arrest, and prosecution of her by Kaiser and Schram without probable cause, she has suffered violations of her First, Fifth, and Fourteenth Amendment rights.

In their Motions for Summary Judgment, Kaiser and Schram argue that the arrests warrants which were issued for Manetta and Swieczkowski bar their § 1983 claims from going forward on two levels. First, Kaiser and Schram contend that Manetta and Swieczkowski cannot, incident to their prima facie § 1983 cases, show that they were deprived of their constitutional rights since arrests warrants were issued the day after their arrest. Secondly, Kaiser and Schram argue that their qualified immunity, as a

prosecutor and a police officer, respectively, entitles them to summary judgment since they objectively had a reasonable belief that probable cause existed to arrest both Manetta and Swieczkowski—as evidenced by the arrest warrants which were issued subsequent to the arrests. Manetta and Swieczkowski respond that Kaiser and Schram cannot rely on the arrest warrants since they were issued the day after they were arrested and that Kaiser and Schram could not have objectively and reasonably believed that probable cause existed in light of the fact that they only had evidence suggesting settlement of a claim, not extortion.

### a. The Warrantless Arrests Themselves Are Not Impermissible Because Arrest Warrants Were Timely Issued.

As a preliminary matter, the Court observes that although the arrests here were initially made without a warrant, this does not itself establish a violation of Manetta and Swieczkowski's federal rights. Law enforcement officials have the authority to make warrantless arrests for felonies committed in their presence, M.C.L.A. § 764.15, consistent with the Fourth Amendment, where probable cause exists to support the arresting officer's belief that the suspects have violated or are violating the law, see, e.g., Criss v. City of Kent, 867 F.2d 259, 262 (6th Cir.1988).

Furthermore, Michigan law, consistent with the U.S. Constitution and other States' laws, provides that "[i]f the accused is in custody upon an arrest without a warrant, a magistrate, upon finding reasonable cause ... shall ... issue a warrant ...," M.C.L.A. § 764.1c. See also, T.L. Baker v. McCollan, 443 U.S. 137, 143, 99 S.Ct. 2689, 2694, 61 L.Ed.2d 433 (1979) ("[t]he probable-cause determination 'must be made by a judicial officer either before or promptly after arrest'" (quoting Gerstein v. Pugh, 420 U.S. 103, 125, 95 S.Ct. 854, 869, 43 L.Ed.2d 54 (1975)). "Promptly" under Gerstein has been construed subsequently by the Court to mean that a probable cause determination within 48 hours of arrest is presumptively reasonable. County of Riverside v. McLaughlin, 500 U.S. 44, 45, 111 S.Ct. 1661, 1664, 114 L.Ed.2d 49 (1991).

### b. The Plaintiffs' Prima Facie Cases under § 1983.

It is well-established that a plaintiff's prima facie case under 42 U.S.C. § 1983 requires a showing that plaintiff possessed a right; that he was deprived of that right; and that the deprivation was caused by the action of a person acting under color of law. See, e.g., Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 155–56, 98 S.Ct. 1729, 1732–33, 56 L.Ed.2d 185 (1978). Moreover, to state and maintain a claim under 42 U.S.C. § 1983 against a police officer and/or a prosecutor pursuant to an allegedly unlawful arrest, a plaintiff must also establish that the arrest deprived the plaintiff of a clearly established federal constitutional or statutory right of which a reasonable official, in the defendant's position, objectively would have known. Cf. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (qualified immunity shields government officials performing discretionary functions from liability under § 1983 unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known) with Masters v. Crouch, 872 F.2d 1248, 1250–51 (6th Cir.1989) (officers and employees were entitled to qualified immunity on claim alleging failure to investigate validity of warrant) and Gibson v. Rich, 44 F.3d 274, 277 (5th Cir.1995) (qualified immunity shields government officials performing discretionary functions, including warrantless arrests) and Singer v. Wadman et al., 595 F.Supp. 188, 289–90 (D.Utah 1982) (arresting officers, insofar as they were ministerially executing a court order for arrest, might be entitled to an absolute quasi-judicial immunity, and, if not insofar as they exercised their discretion in planning and executing the arrest attempt, were entitled to a qualified immunity). Thus, the Court's first step must be to determine if Manetta and Swieczkowski's claims establish that they have been deprived of a federal right, constitutional or statutory.

### 3. Plaintiffs' § 1983 Claims Must be Examined under the Fourth Amendment.

Manetta and Swieczkowski's claims arise out of their arrest and subsequent prosecu-

tion for extortion based on the taped conversations, the signing of the release, and the acceptance of the COMET money. Although Manetta and Swieczkowski allege violations of free speech and due process, their injuries actually result from their arrest and prosecution. Thus, the Court must analyze their claims under the search and seizure law of the Fourth Amendment and not the speech or due process protections of the First, Fifth, and Fourteenth Amendments. *See, e.g., Albright v. Oliver*, 510 U.S. 266, 271–75, 114 S.Ct. 807, 812–13, 127 L.Ed.2d 114 (1994); *Graham v. M.S. Connor et al.*, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). In particular, the Court must consider whether the arrest was based upon probable cause.

### 4. The Meaning of "Probable Cause."

Probable cause is an issue which the Court is to examine objectively from the perspective of the reasonable officer based on the facts and circumstances known to him or her at the time of the arrest. *Id.* As the U.S. Supreme Court has stated, probable cause is defined as "the facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 36, 99 S.Ct. 2627, 2631, 61 L.Ed.2d 343 (1979). It is well-established that probable cause is a mixed question of fact and law so that the circumstances underlying its determination are questions of fact, while the determination itself is a question of law. *See, e.g., United States v. Ho*, 94 F.3d 932, 935 (5th Cir.1996).

### 5. There Was No Probable Cause.

Kaiser and Schram argue that the arrest warrants themselves should bar the instant claims. Manetta and Swieczkowski counter that the warrants for their arrest are insufficient to establish probable cause because the

evidence before the magistrate was insufficient to suggest that they had committed the crime of extortion. Before turning to the questions of probable cause and the effects of the warrants, therefore, the Court must first determine what the elements of extortion are so that it may consider the legal significance of the evidence known to Kaiser, Schram, and the magistrate at the time that the arrests were made and/or the warrants were issued.

### a. The Elements of Extortion under Michigan Law.

Under Michigan law, the crime of extortion is defined as follows:

> Any person who shall, either orally or by written or printed communication, maliciously threaten or accuse another of any crime or offense, or shall orally or by any written or printed communication maliciously threaten any injury to the person or property or mother, father, husband, wife or child of another with intent thereby to extort money or any pecuniary advantage whatever, or with intent to compel the person so threatened to do or refrain from doing any act against his will ...

M.C.L.A. § 750.213. The Court observes that, although this definition is similar to other States' extortion statutes, it is more narrow than those of other States and the Model Penal Code in that it *omits*, as a possible basis for extortion, "expos[ing] any secret tending to subject any person to hatred, contempt or ridicule, or to impair his credit or business repute." Model Penal Code § 223.4. Thus, under principles of statutory construction, it is inferred that, by specifically choosing not to include such a provision in the Michigan extortion statute, the Michigan legislature intended to exclude conduct like Manetta and Swieczkowski's from criminal liability. This conclusion is buttressed by the fact that the Court was unable to find any extortion cases under Michigan law which reasonably paralleled the instant matter.[3]

---

**3.** Kaiser urged the Court in his Reply Brief and at a pre-trial conference to consider the decision in *People v. Watson*, 307 Mich. 378, 11 N.W.2d 926 (1943), for the proposition that the threat of

a lawsuit and its associated disclosure of embarrassing personal information amounted to extortion. Kaiser's argument here is not well-taken because the alleged extortion in that case, which

Furthermore, even in States, that have adopted the Model Penal Code, conduct like that of Manetta and Swieczkowski is subject to criminal liability for extortion only where their claims amount to malicious prosecution, abuse of process, or involves a threat of bad faith publicity or a bad faith lawsuit. *See, e.g. Philippine Export and Foreign Loan Guarantee Corp. v. Chuidian,* 218 Cal. App.3d 1058, 1079–80, 267 Cal.Rptr. 457, 467–68 (1990) ("threats of suit alone are considered within a party's rights, and not characterized as wrongful ... Also it is well known that the 'right' to file a lawsuit has limits, namely the boundaries of the torts of malicious prosecution and abuse of process ... If damaging publicity is inevitable as a result of a lawsuit filed in good faith, surely the filing itself cannot be said to constitute impermissible ... extortion; yet under some circumstances courts have found such duress to exist when the person threatens such publicity before suit or when the lawsuit is not perceived to be brought in good faith"). Kaiser and Schram counter, however, that the "maliciously threaten any injury to the person or property or [family] of another with intent thereby to extort money" provision is a basis for Manetta and Swieczkowski's culpability. A review of Michigan case law suggests that this argument is not well-founded. First, "[t]he underlying purpose of statutory extortion [is] to plug loopholes in the common law crime of robbery," *People v. Krist,* 97 Mich.App. 669, 675, 296 N.W.2d 139 (1980); *People v. Igaz,* 119 Mich.App. 172, 189, 326 N.W.2d 420, 427 (1982), so that "[t]he primary distinction between the offense of robbery and extortion is that in robbery the taking must be without the consent of the party robbed, while in extortion the taking is with consent," *People v. Kruper et al.,* 340 Mich. 114, 120, 64 N.W.2d 629, 632 (1954).

Second, and more to the point, this Court has previously held that:

'Extortion may be defined as wrongfully obtaining anything of value by threat, duress, or coercion. Illegality is the foundation on which a claim of coercion or duress

must exist ... [T]he filing of a civil suit to establish a claim, whether the claim be ultimately determined to be well founded or not, will not in itself be sufficient to show any wrongful duress imposed upon the defendant in such suit. *A statement of intention to file suit to enforce one's claimed legal rights is neither a threat nor the exercise of unlawful or wrongful coercion.'*

*Various Markets, Inc. v. Chase Manhattan Bank,* 908 F.Supp. 459, 468 (E.D.Mich.1995) (citations omitted) (*emphasis* added).

### b. The Mere Issuance of the Arrest Warrants Does Not Bar Plaintiffs' § 1983 Claims.

■ With the Michigan definition of extortion in mind, the Court may now examine what impact the issuance of the arrest warrants has on the § 1983 claims. Kaiser and Schram argue that the arrest warrants prevent Manetta and Swieczkowski from establishing a prima facie case. Manetta and Swieczkowski contend that, because they have challenged the probable cause, or lack thereof, they have sufficiently alleged a § 1983 prima facie case so that the Court must turn to the question of whether or not Kaiser and Schram are entitled to qualified immunity.

The Supreme Court faced a similar issue in *Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). In *Malley,* a state trooper prepared felony complaints charging the § 1983 plaintiffs with possession of marihuana based on the monitoring of two telephone calls pursuant to a court-authorized wiretap. The complaints were presented to a state judge, accompanied by arrest warrants and supporting affidavits. The judge signed the warrants and respondents were arrested, but the charges were subsequently dropped when the grand jury did not return an indictment. The plaintiffs then brought a claim alleging that the trooper violated their civil rights by applying for the arrest warrants and causing them to be arrested without probable cause.

---

involved disclosing the crimes of abortion and adultery, was founded upon "a threat ... to publicly [and maliciously] accuse another of a

crime," *Id.* 11 N.W.2d at 928, and the case has never been cited, in its 54 year history, for the proposition that Kaiser has suggested.

In finding that the trooper was entitled to only qualified, and not absolute, immunity, the Supreme Court held that once a § 1983 plaintiff has alleged that a police officer caused him or her to be unconstitutionally arrested by presenting a judge with a complaint and supporting affidavit which failed to establish probable cause, the court must examine the officer's conduct under the doctrine of qualified immunity because the issuance of a warrant does not make an officer's conduct *per se* objectively reasonable. *Malley,* 475 U.S. at 344–46, 106 S.Ct. at 1097–99.

In light of *Malley,* therefore, the Court finds that Manetta and Swieczkowski have established a prima facie § 1983 claim. Accordingly, the Court will next determine if Kaiser and Schram are entitled to qualified immunity as a matter of law.

#### c. *Kaiser and Schram Are Not Entitled to Summary Judgment on the Basis of their Qualified Immunity.*

■ As the Court observed earlier, to state and maintain a § 1983 claim against a police officer and/or a prosecutor pursuant to an allegedly unlawful arrest, the qualified immunity doctrine requires the plaintiff to establish that the arrest deprived the plaintiff of a clearly established federal constitutional or statutory right of which a reasonable official, in the defendant's position, objectively would have known. *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. Under the rule of qualified immunity, however, a police officer cannot avoid civil rights liability for causing an unconstitutional arrest by simply presenting a judicial officer with a complaint and a supporting affidavit if they fail to establish probable cause. *Malley,* 475 U.S. at 344–46, 106 S.Ct. at 1097–99. In particular, to the extent the officer relies on the warrant to justify the arrest in such circumstances, he cannot be said to be acting in an objectively reasonable manner because his conduct creates an unnecessary danger of unlawful arrest. *Id.* Finally,

when the underlying facts are not disputed, as they are not in this matter, the question of objective reasonableness is one of law. *See, e.g., Dale v. Kelley,* 908 F.Supp. 125, 133 (W.D.N.Y.1995); *Dirienzo v. United States,* 690 F.Supp. 1149, 1155 (D.Conn. 1988); *Oliveira v. Mayer,* 23 F.3d 642, 649 (2d Cir.1994).

It is well-settled that the right to be free from arrest without probable cause is a clearly established constitutional right. *Baker,* 443 U.S. at 143, 99 S.Ct. at 2694. Thus, Kaiser and Schram's ability to invoke the qualified immunity doctrine turns on whether an objectively reasonable official in their position would have known, under the circumstances, that the arrests were unlawful.

Kaiser and Schram's principal argument here is that their beliefs regarding the existence of probable cause are objectively reasonable because arrests warrants were subsequently issued. Under *Malley,* it is clear that Kaiser and Schram's arguments are not well-founded. It is undisputed that the only evidence which induced the arrest and the subsequent warrants was Karam's allegations, the taped conversations, the signed release[4] which Kaiser drafted, and Manetta and Swieczkowski's acceptance of the money. As the Court's analysis of extortion under Michigan criminal law makes clear, none of these items is a basis for an extortion charge. Indeed, with respect to Karam's specific allegations, informing someone of the nature and consequences of a potential sexual harassment claim, and then negotiating a settlement of that claim with them, simply does not suggest the crime of extortion under the Michigan statute and the cases that have interpreted it.

Accordingly, the Court finds that Kaiser and Schram are not entitled to summary judgment on the basis of the warrants or qualified immunity because an objectively reasonable official in their position would not have believed that probable cause existed

4. The signed release reads as follows:
IN EXCHANGE FOR ASKING RAY KARAM FOR $100,000 CASH WHICH I AM PAYING ON THIS DATE AL SWIECZKOWSKI AND COLLEEN MANETTA WHO AGREE TO NEVER TELL THE PUBLIC INCLUDING RAY KARAM'S WIFE, CHILDREN OR ANY FAMILY MEMBER THAT RAY & COLLEEN HAD A LOVE AFFAIR. AL AND COLLEEN WILL NOT ASK ME FOR ANY MORE MONEY IN THE FUTURE, AND THIS WILL BEE [sic] THE ONLY PAYMENT I HAVE TO MAKE.

where they lacked any evidence suggesting that Manetta and Kaiser were committing extortion.[5]

In reaching this decision, the Court is struck not only by the complete lack of evidence supporting the charge of extortion and consequent arrest, but also by the apparent lack of prudent legal analysis and judgment reflected in the prosecutor's and officer's decision to effect the arrests. The Court would like to believe that before an arrest is authorized and effected, particularly one without a warrant, a very careful and thorough analysis would have been made of both the available evidence and how that evidence matched up with the legal elements of the crime. Unfortunately, this does not seem to have been done in this case, as reflected by the State District Judge's rather peremptory dismissal of the charge at the preliminary hearing. Although the mere fact of dismissal itself does not mean that the conduct was objectively without probable cause, here, the body of evidence before the prosecutor and the officer at the time of the decision to effect the arrest of the Plaintiffs seems so completely devoid of a basis to impose criminal liability that this Court cannot conclude that their actions were objectively reasonable.

### d. *Schram Is Not Entitled to Qualified Immunity Simply Because He Relied on Kaiser's Determination of Probable Cause.*

■ Schram argues further, however, that he is entitled to qualified immunity because it was objectively reasonable for him to rely on Kaiser's determination of probable cause. Swieczkowski, however, counters that this reliance is not objectively reasonable because of the complete lack of evidence suggesting extortion.

When a police officer relies upon a prosecutor's determination of probable cause, his reliance is objectively reasonable and entitles him to qualified immunity where the law underlying the probable cause determination is not clear or well-established or is otherwise a matter about which reasonable attorneys could disagree. *See, e.g., England v. Hendricks,* 880 F.2d 281, 284 (10th Cir.1989) (police officers had qualified immunity from suit under 42 U.S.C. § 1983 where the applicability of Utah's aider and abettor law to the plaintiffs was unclear, and the officers consulted with and relied on the advice of a county attorney); *Arnsberg v. United States,* 757 F.2d 971, 982 (9th Cir.1985) (IRS agents had qualified immunity in *Bivens* action for executing invalid arrest warrant where they obtained and relied on advice of an assistant United States attorney that probable cause existed, and reasonable attorneys could disagree about the probable cause assessment); *Salzer v. Dellinger,* 54 F.3d 779, 1995 WL 283986, *4 (7th Cir.1995) (unpublished) (officer entitled to qualified immunity where they relied upon advice of county prosecutor for determining probable cause because the relevant statute was untested).

In light of these decisions, the Court finds that at this stage of the proceedings, there is no evidence of record from which the Court could conclude that Schram's reliance on Kaiser's determination of probable cause was objectively reasonable. In the Court's view, the Michigan extortion statute on its face, and the cases under it, provide no clear basis for believing that threatening a lawsuit for sexual harassment, and the attendant disclosure of an affair, are a basis for the crime of extortion. Moreover, to the extent that Schram may argue that the Michigan extortion statute is untested or not clearly established, it is only such to the extent that no Michigan court has ever held people liable for the conduct in which Manetta and Swieczkowski engaged. Additionally, the dearth of evidence of extortion, even under jurisdictions which follow the Model Penal Code version of the statute, would also suggest that Schram's conduct here was not objectively reasonable.

---

5. The Court notes that to the extent Kaiser's "investigation" violated Manetta and Swieczkowski's rights, this too is a matter of qualified—as opposed to absolute—immunity. *Buckley v. Fitzsimmons et al.,* 509 U.S. 259, 272–73, 113 S.Ct. 2606, 2615–16, 125 L.Ed.2d 209 (a prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity; rather, they are subject to only qualified immunity).

### C. *Swieczkowski's State Tort Claims Against Kaiser and Schram.*

 In his Complaint, Swieczkowski alleges that Kaiser and Schram are liable, pursuant to his arrest and prosecution, for false arrest, false imprisonment, malicious prosecution, negligence, and gross negligence. Schram argues that since there was probable cause for the arrest, Swieczkowski cannot maintain any state tort claims. Kaiser, however, asserts that he is entitled to summary judgment since his conduct did not amount to gross negligence.

Schram's argument may be summarily disposed of since the Court has concluded that the arrest warrants may not be relied upon for establishing either probable cause or objective reasonableness given the absence of any evidence of extortion. Thus, the Court will only discuss Kaiser's argument regarding gross negligence.

Under Michigan law, a government official acting in his official capacity will be immune from tort claims related thereto provided:

(a) The officer, employee, member or volunteer is acting or reasonably believes he or she is acting within the scope of his or her authority.

(b) The governmental agency is engaged in the exercise or discharge of a governmental function.

(c) The officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage. As used in this subdivision, "gross negligence" means conduct so reckless as to demonstrate a substantial lack of concern for whether injury results.

M.C.L.A. § 691.1407(2). A finding of gross negligence is a question of fact. *See, e.g., Pardon v. Finkel,* 213 Mich.App. 643, 647–48, 540 N.W.2d 774, 775 (1995); *White v. Humbert,* 206 Mich.App. 459, 466, 522 N.W.2d 681, 684 (1994).

Because Manetta and Swieczkowski have argued, and the Court has agreed, that the arrest warrants do not establish probable cause or objective reasonableness, the Court must conclude that there is a material issue of genuine fact regarding whether or not Kaiser committed gross negligence. Therefore, the Court must deny his Motion for Summary Judgment as to Swieczkowski's pending state tort claims.

### IV. *CONCLUSION*

For the foregoing reasons,

NOW, THEREFORE, IT IS HEREBY ORDERED that Macomb County's Motion for Summary Judgment as to Plaintiff Manetta is GRANTED;

IT IS FURTHER ORDERED that Kaiser's Motion for Summary Judgment as to Plaintiffs Manetta and Swieczkowski is DENIED;

IT IS FURTHER ORDERED that Schram's Motion for Summary Judgment as to Plaintiff Swieczkowski is DENIED.